ANNA SINDELAR, APPELLEE, V. T. B. HORD
GRAIN COMPANY, APPELLANT.

FILED APRIL 13, 1928. No. 25829.

*E. J. Patterson* and *Elmer E. Ross,* for appellant.

*Bartos, Bartos & Placek, contra.*

Heard before GOSS, C. J., ROSE, GOOD, THOMPSON, EBERLY and HOWELL, JJ., and REDICK, District Judge.

THOMPSON, J.

We find submitted for our consideration an action at law appealed by the defendant, T. B. Hord Grain Company, from a judgment rendered in the district court for

Merrick county on a directed verdict at the close of the evidence on motion of plaintiff, Anna Sindelar, for the sum of $2,274.44. The errors relied on for reversal in the motion for new trial, as well as in the briefs here, may be resolved into two: (a) The court erred in sustaining the motion for a directed verdict; (b) the court erred in permitting the plaintiff's witnesses to testify to declarations of defendant's agent concerning his power to receive and store grain in defendant's elevator.

The record discloses that defendant is, and was at the times involved herein, a corporation organized for the purpose of buying, storing and selling grain; that in furtherance of such purpose it had built and equipped, and was operating, numerous elevators at sundry places in the north central part of this state, the main office and elevators being situate in Central City, Merrick county; that of the elevators so owned and operated was one at Ord, Valley county, which latter was in charge of one Geseking, and had been at the dates in question herein for five years or more; that the plaintiff operated a farm near Ord, and had raised and had in her possession 1639 bushels of wheat; that her son and husband were farmers also, the husband being the owner of wheat which he had raised; that these people had concluded to move to Saline county, Nebraska, which necessitated a disposition of these wheat holdings; that, in furtherance thereof, the husband testified at the trial as follows:

"Q. Now just tell the jury what that transaction was (in November, 1924). A. I hauled a load of (my) wheat into the elevator and he (Geseking) bought it of me, and I didn't feel like selling it on account it was too low, and he said 'You can haul in the rest of it and I will store it for you, T. B. Hord Company storage, and you can leave it as long as you want to.' And I said, 'What about storage?' And he said, 'I will charge you two cents a bushel,' and I sold him the first load at $1.10. I received the check for it, and the next day I started to haul. Q. How much did you haul? A. 285 bushels. Q. Did you

leave it for storage? A. Yes, sir. Q. How long was that in the elevator before you sold it? A. About two months. Q. When did you get the money for it? A. December 30. Q. Who paid you for it? A. Ben Geseking. Q. What kind of a check did he give you, his own, or what? A. Just an elevator check. Q. Hord Grain Company check? A. Yes, sir. Q. Did he charge you any storage? A. Yes, sir. Q. Do you remember how much it was? A. The wheat was $1.55 and he gave me $1.53, so he charged me two cents a bushel." Further, as to the wheat here in question, the husband testified: At the time he delivered the first load of his wheat, "I told him (Geseking) my wife had good wheat and we would like to haul it but the price was so low we didn't feel like hauling it, and he said we might as well haul it 'just like you, T. B. Hord Company storage, just like you,' she can leave it as long as she wants to and when she wants the money he will give her the check. Q. Did you tell your wife that? A. Yes, sir. Q. Did you help haul this wheat of your wife's? A. Yes, sir. Q. How many loads did you haul? A. Fourteen loads."

As to a conversation between Geseking and the husband relative to plaintiff's wheat on March 7, 1925 (the three being present), the husband testified:

"Q. Tell us what that conversation was. * * * A. She asked him (Geseking) about the price and he told her the price, if I am not mistaken it was $1.40, and she thought it was low, and he said 'You might as well leave it here in storage with the T. B. Hord Company.' * * * He said she can leave it just as long as she wants to, and we said all right, and we told him that whenever she be ready for it she going to phone him or writing him or let him know and he could send the check, and she said, 'If the wheat come to $1.50 you don't need to wait for call or letter, just sell the wheat and send the money to me,' and he said, 'All right.' "

Further, the husband had a talk with Geseking over the telephone in October, 1925, and Geseking told him:

"At any time you are ready I will be willing to send the check, just drop me a few lines." "Q. Then, you never heard Geseking say anything about storing your wife's wheat, did you? A. Yes, sir; he told me he would do just the same thing with her he done with me—store her wheat and she can leave it as long as she wants to. Q. There was no time fixed when she would have to take the money for her wheat? A. No; she could leave it. Q. Indefinitely? A. Yes, sir; she could get the money whenever she wants to."

The son testified, as to plaintiff's wheat: "Well, I went to the Hord elevator (about January 23, 1925,) and asked him (Geseking) about the price and he told me $1.10, and I said, 'That is pretty low, but we got to haul it some place because we are going to move to Saline county.' And he said, 'You don't have to sell it, you can leave it here.' And I said, 'How do you do it? They told me they don't store wheat in the other elevator' (there were two elevators at Ord). And he said, 'The T. B. Hord Company has a license.' And I said, 'Will you charge me storage?' And he said, 'Yes; two cents a bushel.'" He testified that they started to haul this wheat about January 30, 1925, and finished sometime the last of February of that year; that the wheat tested about 60 pounds per bushel measure. Further, the son testified: "Well, when I got done hauling I told him (Geseking) it was the last load, and he gave me the last slip I had from the loads, and he told me whenever I get ready I can make demand for payment and he will give me the check."

This evidence is corroborated and strengthened by other witnesses, and by these witnesses by way of subsequent conversations had with Geseking. The demand for payment for the wheat was made before the commencement of this action, and at a time when the wheat was of the market value of $1.39 a bushel, to wit, March 5, 1926, and payment therefor refused. The record further shows that there were 31 loads of wheat so delivered and placed in such elevator at Ord, and that at the time each load

was delivered the deliverer thereof received from Geseking a slip showing the gross weight of the load, the tare weight, the net pounds of wheat, and in some instances the number of bushels. There is also evidence showing that other wheat had been similarly received, stored and paid for at this Ord elevator, previous to the receipt of plaintiff's wheat, from other farmers, which was known by the son and husband of plaintiff at the time.

Under the record as thus disclosed, the defendant introduced evidence tending to prove that the manager of the corporation was one J. W. Hutchinson, domiciled at Central City, and that he had been such manager since about 1902; that the corporation had never procured a warehouse or storage license for any one or more of its elevators; that as such manager Hutchinson had procured to be prepared and distributed to the different agents in charge of defendant's respective elevators a circular letter of instructions in which such agent was directed not to receive grain for storage for a time longer than nine days, and that within such limitation all grain so received should be paid for by him; that such manager, as a further instruction to such agent in charge, and as a. means of conveying such information to those dealing with him, procured to be prepared and sent to each elevator a pasteboard placard, approximately 11 by 14 inches, containing thereon in bold type:

"THIS IS NOT A PUBLIC WAREHOUSE. NO STORAGE. UNDER THE NEW STATE LAW WE WOULD BE SUBJECT TO HEAVY PENALTY IF WE SHOULD STORE GRAIN. T. B. HORD GRAIN Co."

That such circular was seen by the witness Hutchinson, and also by defendant's auditor, Barkmeier, in the elevator at Ord, posted in a conspicuous place at times before and after the dates in question, as was also the placard which was posted on one side of the driveway leading to the dump where grain brought to such elevator was unloaded. It might be said in this connection that on cross-examination, had on the part of the defendant, the son of plaintiff testi-

fied that he did not see, and neither did he ever know of, such circular or placard, and no one testified that he did see them or either thereof, and, as we find, he was the one who finally closed the deal for plaintiff. Further, the record is without evidence showing or tending to show that the plaintiff was in or around this elevator before the delivery of her wheat. The defendant was also permitted to submit testimony tending to show that a book kept at the Ord elevator showed that the husband had delivered and placed in defendant's elevator the number of bushels of his wheat which his testimony indicated, but that the same was delivered on December 27, and check issued in payment therefor, and that the receipt of the husband's wheat was not shown by such book prior to that date. This witness who identified such book was also permitted to testify that he had examined it and that there was nothing therein contained showing the receipt of the wheat delivered by the plaintiff. The book was not introduced in evidence, and neither was there any foundation laid for its introduction as by our statutes required, or otherwise. The evidence is conclusive that the husband delivered his wheat in November, 1924, and got his pay therefor the latter part of December of the same year. Hence, the most that could be credited to the evidence of what the book showed, if competent, would be that Geseking, acting for the corporation, did not enter on this book the receipt of wheat received by it for storage until such stored wheat was paid for. This, however, could not militate against the plaintiff. The witness Hutchinson, on the part of the defense, testified that at the time and place the demand was made for an accounting for the wheat, in the presence of a number of persons, the son, herein referred to, stated that Geseking said, "If you keep your mouth shut, it will be all right," meaning as to the transaction in question. The defendant's witness King, who was present at the time, in detailing the conversation stated: "He (the son) said that they wanted to get more money for the wheat, and wanted to store it, and Geseking told him that he

did not have the authority to store it, but if he kept his mouth shut he would store it for him." It might also be suggested here that the son was interrogated on cross-examination as to whether or not he had not made the statements at this meeting, as related by the witnesses Hutchinson and King, respectively, and in answer to each of such questions he entered a positive denial. This contradiction of the son's testimony as to a statement made by him in regard to a long past event, he not being a party to the action, was not substantive evidence. At best, such evidence, if believed by the jury, could only go to the weight of the son's testimony. *Zimmerman v. Kearney County Bank*, 59 Neb. 23. As we have seen, as to the material facts this witness is sustained by the testimony of the father, the mother, and in some regards by other disinterested witnesses. Under this record, the son's testimony might be omitted entirely from the consideration of the jury, or that of the court, as the testimony of each of the other witnesses for plaintiff is without evidence of a refuting nature. Geseking, the only person who could have, under the detailed facts in this case, given any other version of the transaction than that given by the plaintiff's witnesses, was not sworn nor examined at the trial.

That the defendant received the wheat in its elevator, without collusion or connivance on the part of plaintiff either with the defendant or its agent, that it was of the market value and consisted of the number of bushels, and that the same had not been paid for or accounted for by defendant on due demand having been made therefor by plaintiff, as found by the trial court, is without question.

In considering whether or not the trial court erred in its instruction directing the jury to return a verdict in favor of the plaintiff as it did, we must bear in mind that this court has never adopted the *scintilla* of evidence rule. As stated in 2 Thompson on Trials (2d ed.) p. 1504 (quoting with approval from *Ryder v. Wombwell*, L. R. 4 Exch. 32, 38) : "It was formerly considered necessary in all cases

to leave the question to the jury, if there was any evidence, even a *scintilla,* in support of the case; but it is now settled that the question for the judge (subject, of course, to review) is, as stated by Maule, J., in *Jewel v. Parr* (13 C. B. 909, 916, 'not whether there is literally *no* evidence, but whether there is none that ought reasonably to satisfy the jury that the fact sought to be proved is established.' " In speaking of this rule, it is further stated in the above text at page 1505 (quoting with approval from *Commissioners v. Clark,* 94 U. S. 278, 284): "Decided cases may be found, where it is held that, if there is a *scintilla* of evidence in support of a case, the judge is bound to leave it to the jury; but the modern decisions have established a more reasonable rule, to wit, that, before the evidence is left to the jury, there is, or may be in every case, a preliminary question for the judge, not whether there is literally *no* evidence, but whether there is any upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the burden of proof is imposed."

Thus, the question for our determination is: Whether or not, taking the evidence as a whole, any other verdict than the one directed could have been returned by the jury?

"It is not reversible error for the trial court to direct the jury to return a verdict for one of the parties where, upon the evidence, no other verdict than the one directed can be sustained." *Zimmerman v. Kearney County Bank,* 3 Neb. (Unof.) 323.

"Where only one conclusion can be drawn from the evidence, the court should direct a verdict." *Chesley v. Rocheford & Gould,* 4 Neb. (Unof.) 768.

Where, under the record, reasonable minds would not be warranted in drawing different conclusions as to the involved facts, it is not error for the court to direct a verdict.

In *Pollock v. Pearson,* 101 Neb. 284, we held: "It is the duty of the trial court to instruct the jury to find

for defendant when the evidence is not sufficient to sustain a verdict for the plaintiff."

If the foregoing is a correct statement of the law under the proved facts in that case, then the converse thereof would be applicable under the proved facts in this case. Our holding in *Pollock v. Pearson, supra,* was by us amplified and strengthened in *Farmers State Bank v. Butler,* 101 Neb. 635, wherein we announced the following rule:

"When there is no substantial conflict in the evidence upon matters to be submitted to the jury, so that a verdict for the defendant upon those matters could not be sustained, it is the duty of the court to 'instruct for the plaintiff upon those issues."

As to the challenge that the court erred in permitting the evidence of the son, the husband, and others to be introduced as to conversations had with Geseking, it is sufficient to say that Geseking was the only one in charge of the Ord elevator, and was the only person that could, with practical business expediency, be interrogated in reference to the matters inquired about. Hence, he was acting in the apparent scope of his authority in the matters detailed by these respective witnesses, and, as we held in *Union P. R. Co. v. Gregory Coal Co.,* 103 Neb. 421: "An act of an agent, although without actual authority from his principal, may be with such apparent authority as to bind his principal." Such apparent authority of the agent cannot be extended or restricted by by-laws or other instructions to the agent by its principal, in the absence of actual notice thereof. *Johnson v. Milwaukee & Wyoming Investment Co.,* 46 Neb. 480.

It is our conclusion that error was not committed by the trial court, either in sustaining the motion for a directed verdict in favor of the plaintiff, or in permitting the complained of testimony to be introduced.

The judgment of the trial court is right, and is

AFFIRMED.