HENRY S. CLOUSE, APPELLEE, v. SAINT PAUL FIRE AND MARINE INSURANCE COMPANY, A CORPORATION, APPELLANT.
40 N. W. 2d 820

Filed January 19, 1950. No. 32698.

*E. A. Cook, Jr.,* and *Wells, Martin & Lane,* for appellant.

*W. A. Stewart,* for appellee.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

WENKE, J.

Henry S. Clouse brought this action in the district court for Dawson County against the Saint Paul Fire and Marine Insurance Company, a corporation. The purpose of the action is to recover for loss suffered by plaintiff to his real and personal property which he alleges was caused by lightning, a risk covered by two policies of insurance that had been issued thereon by defendant. Defendant denied that plaintiff suffered any loss from causes covered by either of its policies. Verdict was for the plaintiff and from a judgment entered thereon, its motion for judgment notwithstanding the verdict or for a new trial having been overruled, defendant appeals.

After the appeal was perfected the appellee died. His

death being suggested to the court the action was revived in the name of Mary Clouse, executrix of the estate of Henry S. Clouse, deceased, as appellee.

Admittedly, or by undisputed evidence, the record establishes that Henry S. Clouse was the owner of a two-story brick building located on Lot 19 in Block 10 in the town of Sumner, Dawson County, Nebraska; that he owned the office furniture, fixtures, counters, shelves, showcases, scales, and cash registers located therein and used by the tenant thereof, Earl McFarland, in operating a store therein; that appellant had issued two policies of insurance, both in effect on June 22, 1947, covering the building and the foregoing personal property located therein against direct loss or damage caused by lightning; and that in the early morning of June 22, 1947, somewhere between the hours of 1 a. m. and 2 a. m., the older or south portion of this building collapsed and seriously damaged the building and also the personal property which was located therein.

Just what caused the building to collapse and do the damage that it did is the question in issue. Appellant contends that the evidence establishes, without question, that the only proximate cause of the west wall of the older part of the building collapsing was that water had seeped into the ground and saturated the dirt under the foundation thereof and so weakened its structural support that it settled and this caused the wall to collapse. That there is ample evidence in the record to support this theory is beyond question and the jury was properly advised thereof. However, the jury expressly found, as shown by its answer to interrogatory No. 1, and its general verdict, that lightning struck the building and that it was the proximate or direct cause of the building collapsing and doing the damage that it did. Under this situation the question arises as to whether or not the record contains sufficient evidence to support the jury's verdict, for if it does, then the verdict and judgment entered thereon must stand.

"In a jury case where different minds may draw different conclusions or inferences from the adduced evidence, or if there is a conflict in the evidence, the matter at issue must be submitted to the jury, but where the evidence is undisputed, or but one reasonable inference or conclusion can be drawn from the evidence, the question is of law for the court." Hamblen v. Steckley, 148 Neb. 283, 27 N. W. 2d 178. See, also, Fulcher v. Ike, 142 Neb. 418, 6 N. W. 2d 610.

As stated in Fairmont Creamery Co. v. Thompson, 139 Neb. 677, 298 N. W. 551: "The rule is well stated in Farr Co. v. Union P. R. Co., 106 Fed. (2d) 437, as follows: 'The rule is that in every case, before the evidence is left to the jury, there is a preliminary question for the judge, not whether there is literally no evidence, but whether there is any upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the burden of proof is imposed.' " See Sindelar v. Hord Grain Co., 116 Neb. 776, 219 N. W. 145.

However, "In testing the sufficiency of evidence to support a verdict it must be considered in the light most favorable to the successful party, that is, every controverted fact must be resolved in his favor and he should have the benefit of every inference that can reasonably be deduced therefrom." Remmenga v. Selk, 150 Neb. 401, 34 N. W. 2d 757.

"A policy against loss or damage caused by lightning to the property insured usually covers all known effects of electricity coming under the general head of lightning, and includes all loss or damage which results as a direct and natural consequence of the lightning, notwithstanding other incidental agencies may be instrumental in adding to the loss or damage." 37 C. J., Lightning Insurance, § 2, p. 661.

Under the terms of these policies appellant was only liable for "direct loss" caused by lightning. "Direct," as so used, means "immediate" or "proximate," as distinguished from "remote" or "incidental." See Tracy v.

Palmetto Fire Ins. Co., 207 Iowa 1042, 222 N. W. 447; and Trexler Lumber Co. v. Allemannia Fire Ins. Co., 289 Pa. 13, 136 A. 856.

In determining the cause of a loss for the purpose of fixing insurance liability, when evidence of concurring causes of the damage appears, the proximate cause to which the loss is to be attributed is the dominant, the efficient one that sets the other causes in operation; and causes which are incidental are not proximate, though they may be nearer in time and place to the loss. Parish v. County Fire Ins. Co., 134 Neb. 563, 279 N. W. 170, 126 A. L. R. 703; Tracy v. Palmetto Fire Ins. Co., *supra;* Trexler Lumber Co. v. Allamannia Fire Ins. Co., *supra;* and 6 Couch, Cyclopedia of Insurance Law, § 1466, p. 5303.

The jury was so instructed.

There is evidence in the record that Henry S. Clouse bought Lot 19, which is 27½ feet wide and 130 feet long, about 1920; that at that time there was located on the south end thereof a two-story brick building 25 feet wide and 60 feet long, which had been constructed sometime between 1892 and 1894; and that in 1922 he built a two-story brick addition thereto which was 27½ feet wide and 70 feet long. This made the over-all length of the building 130 feet or the entire length of the lot. The building faced south but the entire east side thereof also fronted on a street. To the west was a vacant lot.

Between 7 and 8 p. m. on the evening of June 21, 1947, an extremely heavy lightning, thunder, and rain storm began at Sumner. It resulted in about seven inches of rain falling. During the latter part of this storm, sometime between 1 and 2 a. m. of June 22, 1947, the south or older part of this building collapsed and completely demolished it and the contents thereof, and seriously damaged the new or north part of the building.

At the time of its collapse Earl McFarland, the tenant occupying the building, had just left it, having checked on the conditions in the basement. He testified that

shortly after 1 a. m. he was returning from the building, having left it at the south door, to a restaurant located southwest thereof; that when about 50 or 60 feet from the building, and while walking away from it, there was a loud crash of lightning and thunder, brighter than the others, which lit up the sky; that it chilled him so he could not move for a little bit; that he hesitated a moment and then turned around; and that as he turned around the building was going down. He testified that the building started to go down on the west side, the west wall falling mostly to the east, the east wall to the east, and the south front to the south.

Kenneth Reier, a farmer living in the southwest corner of Sumner and about a quarter of a mile from this building, testified that shortly after 1 a. m. on June 22, 1947, while he was standing in his yard, he noticed a particularly heavy bolt of lightning and heard a loud crash of thunder. This lightning was toward the northeast and he thought it was in the neighborhood of this building.

At the time of its collapse there were three young men sitting in a parked car who saw the building fall. The car in which they were sitting was parked just east of a flagpole located in the intersection southeast of the building. They were parked some 50 or 60 feet from the building itself, facing north. These men were Jack Rodgers, Daniel Houchin, and Robert Burr.

Jack Rodgers testified that he was sitting in the front seat of the car; that just after McFarland left the building, which he had seen him enter, there was an awful big flash of lightning which seemed to come from the northwest; that it was brighter and closer than any other lightning that evening; that it lit up the whole block; that it had a blinding effect; that there was a loud crash; that immediately following the building fell; and that dust and debris were in the air.

Daniel Houchin, who was sitting in the front seat with Rodgers, testified that he saw McFarland come out

of the building shortly after he had gone in; that immediately thereafter there was a tremendous flash, just kind of a streak of light or something; that it lit up that part of the town; that it was real close and a lot brighter than any other lightning that evening; that it just kind of stunned or blinded him for a second or two; that a big crash and rumbling noise followed and the building was falling down; and that a lot of dust rose up in the air right afterward, sort of a haze.

Robert Burr, who was sitting in the back seat of this same car, testified that he saw a big flash or streak or bolt of lightning; that it kind of dazed or blinded him; that it was much stronger than any others that he had seen that night; that he then saw the building fall; and that a lot of dust and debris was in the air.

Mr. and Mrs. Carl Wuehler, who were returning to their farm home from Kearney, parked their car just east of the Scoville filling station in Sumner. They parked there between 1 and 2 a. m. They stopped for the purpose of putting on chains and, in doing so, parked their car facing south. This filling station is located a little over a block north of the building.

Carl Wuehler testified that while out of the car and standing by a back wheel of his car there was an awful flash of lightning toward the southeast; that it was much brighter than any he had seen that evening; that it was close and just sort of numbed and blinded him for a few seconds; that it made a noise just like when lightning strikes; that they drove down town and there saw that appellee's building had collapsed; and that there was a kind of fog or dust in the air.

Mrs. Carl Wuehler testified that while sitting in the front seat of the car facing south she saw an awful flash of lightning; that the minute it hit there was an awful noise; that the flash blinded her for a short while; that she could see lines of lightning; that when they drove down town she saw the building had col-

lapsed; and that there was kind of a fog in the air above the building.

What was said in Spensley v. Lancashire Ins. Co., 54 Wis. 433, 11 N. W. 894, is here applicable. Therein the court said:

"The policy before us is a general insurance against lightning, and most certainly covers all known effects of electricity coming under the general head of lightning. What, then, is to be understood by the word 'lightning' in its 'plain, ordinary and popular sense?' "

It was held in the third paragraph of the syllabus of the case last cited:

"The word 'lightning,' in its ordinary and popular sense, applies to any sudden and violent discharge of electricity, occurring in the course of nature, between positively and negatively electrified bodies, usually developing in its course the phenomena of light, heat and disruptive force."

Evidence as to what was the proximate cause of the building's collapse and the resulting damage arising therefrom is in dispute. As stated in Cummings v. Pennsylvania Fire Ins. Co., 153 Iowa 579, 134 N. W. 79, 37 L. R. A. N. S. 1169, Ann. Cas. 1913E 235: "As the hail ceased falling, the west wall of the building collapsed, and most of the property mentioned was precipitated into the water and debris. Whether this was caused by a stroke of lightning or water undermining the wall was an issue upon which the evidence was in conflict. * * * the evidence was in sharp conflict as to whether the building was struck by lightning, and we are not inclined to interfere with the verdict of the jury." And in Warmcastle v. Scottish Union & National Ins. Co., 210 Pa. 362, 59 A. 1105: "In an action on a policy of insurance against a direct loss from lightning, but not from a windstorm, the case is for the jury where one witness testifies that a flash of lightning and the fall of a side wall of the building insured were simultaneous, and another testifies to the same thing as to the roof

with the further fact that the material fell outward toward the wind." See, also, Beakes v. Commercial Union Assur. Co., 65 Hun 621, 20 N. Y. S. 37.

We find that there is sufficient evidence to support the jury's verdict and that it cannot be said that it is based on mere surmise, speculation, or conjecture, and therefore clearly wrong.

In this respect we have not overlooked the testimony of the appellant's expert witness, Professor John C. Jensen, to the effect that certain conditions exist, such as concussion, near the point where a large bolt of lightning strikes and that a streak of light would momentarily remain on the retina of the eye of anyone watching a large streak of lightning at close range. It is true that apparently appellee's witnesses either did not observe these effects or were not consciously aware thereof because they did not testify thereto. However, that fact does not completely destroy their testimony but may be considered by the jury in determining their credibility and the weight to be given their testimony.

Appellant contends there is a complete lack of evidence as to cost of repair or replacement, which he claims is an essential element of appellee's case.

The policies respectively provide as follows: No. OM 13162—"This Company shall not be liable beyond the actual cash value of the property at the time any loss or damage occurs, and the loss or damage shall be ascertained or estimated according to such actual cash value, with proper deduction for depreciation however caused, and shall in no event exceed what it would then cost the insured to repair or replace the same with material of like kind and quality; * * *." And No. OM 14505— "* * * to the extent of the actual cash value of property at the time of loss, but not exceeding the amount which it would cost to repair or replace the property with material of like kind and quality within a reasonable time after such loss, * * *."

Appellee offered evidence to the effect that the fair

market value of the building, before it collapsed on June 22, 1947, was $17,000 and after it collapsed it was $2,000. Also that the fair market value of the personal property covered by the insurance and located in the building was, before the building collapsed, in the sum of $2,275 and by the building collapsing it was totally destroyed and of no value. The appellant offered no evidence of what it would cost to repair or replace the property damaged with material of like kind or quality.

We considered a like or comparable provision in the case of Voges v. Mechanics Ins. Co., 119 Neb. 553, 230 N. W. 105. Therein we approved the conclusion reached by the Supreme Court of Vermont in construing an identical provision in the case of Citizens' Savings Bank & Trust Co. v. Fitchburg Mutual Fire Ins. Co., 86 Vt. 267, 84 A. 970. Therein the Supreme Court of Vermont stated: "The policy makes the cash value of the building destroyed the basis of ascertainment, taking into account its previous depreciation from all causes; and makes the cost of present construction a mere limitation upon the extent of the recovery. The cost of a new building may limit the recovery, but cannot be made a controlling factor in the conduct of the inquiry. The cash value of the building destroyed is the fundamental fact to be established, and any evidence which has a legitimate tendency to prove that fact is admissible. * * * The apparent purpose of the provision is to protect the insurer from appreciations of real estate values which are not caused by and do not depend upon the cost of construction. The policy does not make the cost of replacement the invariable test of actual cash value, but limits the recovery in cases where an ascertainment according to actual cash value would exceed that amount. The plaintiff proceeds to make out his case by any evidence which legitimately tends to show actual cash value. The defendant may guard against a possible finding in excess of the cost of replacement by introducing evidence of what the cost would be. But it cannot confine the

plaintiff to proof of that character by making the cost of construction the basis of ascertainment."

As held in Voges v. Mechanics Ins. Co., *supra*: "* * * the provisions of this policy contemplate that the 'actual cash value' of the building as it stood on the ground prior to the fire shall be compared with the 'actual cash value' of the same building at the conclusion of the fire, and that the difference shall be taken as the measure of damages, subject, however, to the limitations expressed in the terms of the policy."

Appellant offered no evidence of what it would have cost to repair or replace the property damaged with material of like kind or quality. If such cost was less than the actual cash value of the damage to the property appellant could have protected itself under this limitation by introducing evidence of what that cost would have been. But under this provision it cannot require the appellee to prove what it would have cost to repair or replace the damaged property with material of like kind and quality. We said in Voges v. Mechanics Ins. Co., *supra*: "That the provision, 'the loss or damage * * * shall in no event exceed what it would then cost the insured to repair or replace the same with material of like kind and quality,' constitutes merely a limitation upon the amount of the recovery, and is not a substantive measure of damages which the insured can invoke."

Although the court, by its instruction No. 11, placed this limitation on appellee's right to recovery, that is, "not exceeding in any event the cost of repair," when appellant had offered no proof thereof, we do not think it thereby committed prejudicial error. If anyone can be said to have been prejudiced by this instruction, it would be appellee for appellant was given the benefit of this limitation of its liability without having offered any evidence in support thereof.

As stated in Johnson v. Samuelson, 116 Neb. 297, 216 N. W. 810: "Where an instruction, though erroneous, is not prejudicially so and cannot by any course of

logical reasoning be deemed to have resulted in disadvantage to the complaining party, it should not be allowed to work a reversal."

On this issue we find the proof made by appellee is sufficient to support the jury's verdict as to the amount of loss or damage suffered. It was neither incumbent upon nor proper for appellee to offer proof of the cost to repair or replace the property damaged with material of like kind or quality. That was a limitation available to the appellant and, if it was desired to take advantage thereof, evidence should have been introduced by it for that purpose.

Appellant also complains of the admission of exhibits 15 to 20, inclusive, to each of which he made objection as being irrelevant, immaterial, and that no proper foundation was laid for the admission thereof.

Exhibits 15 and 16 constitute the charred ends of a 2 by 12 inch joist or rafter. Exhibits 17 and 18 constitute the charred ends of another 2 by 12 inch joist or rafter. Exhibits 19 and 20 are each a part of a charred lath.

The evidence shows that these exhibits were taken from the debris of the building sometime after it collapsed and were discovered while the debris was being removed. These 2 by 12 inch joists or rafters, from which these exhibits were cut, were stringers supporting the second floor of the building at a point about 10 feet south of the north end of the old building. These stringers ran east and west and the portion cut off was at the west end. The pieces of charred lath were taken from the lathed area between these two stringers. There were two chimneys built in the west wall of the old building, one being about 10 feet south of the north end thereof. It was in the nature of a flue built in the wall. The stringers that were charred were in line with this flue. There was no evidence of any fire at the time the building collapsed.

After these exhibits were received in evidence the appellant introduced evidence that the west ends of the

joists, from which these exhibits were taken, were near the north flue in the west wall of the old building; and that often flues built in walls become defective and cause nearby joists and laths to become charred without actually causing a fire to break out in the building.

In the absence of any evidence of a fire occurring at the time the building collapsed these exhibits were not relevant to the issue. What occurred at that time is material to the issues here. However, every error is not necessarily prejudicial and unless it can be said to have resulted in disadvantage to the party complaining it is not legal cause or reason for granting a new trial.

It is true that fires sometimes occur when lightning strikes and that the two are often associated together by the public. However, from an examination of the entire record, considering the question here involved, we do not find that appellant was prejudiced by the admission of these exhibits.

We think the evidence presented a jury question, that it was properly submitted, and that there was no prejudicial error in the admission of evidence which requires a reversal. We therefore affirm the judgment of the trial court entered on the verdict of the jury.

AFFIRMED.