NORRIS OLSON, APPELLEE, V. LE MARS MUTUAL
INSURANCE COMPANY OF IOWA, APPELLANT.
696 N.W.2d 453

Filed May 13, 2005.   No. S-04-045.

Albert M. Engles, Jason R. Yungtum, and Robert B. Quigley, of Engles, Ketcham, Olson & Keith, P.C., for appellant.

Kenneth F. George, of Jacobsen, Orr, Nelson, Wright & Lindstrom, P.C., for appellee.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

STEPHAN, J.

A grain storage building owned by Norris Olson and insured by Le Mars Mutual Insurance Company (Le Mars) was damaged by hail. The cost of repairing the damage was $95,040. The issue

presented is whether the insurance policy permits the insurer to deduct a depreciation factor from the repair cost in adjusting the loss. We agree with the district court for Buffalo County that it does not.

## BACKGROUND

Olson purchased a commercial property insurance policy from Le Mars to insure a grain storage building located in Buffalo County, Nebraska, for the period from March 20, 2002, through March 20, 2003. The policy insured the property against various types of loss, including hail. The coverage limit was $160,000, with coinsurance of 80 percent and a $500 deductible. The policy included the following provisions:

4. **Loss Payment**

a. In the event of loss or damage covered by this Coverage Form at our option, we will either:

1) Pay the value of lost or damaged property;

2) Pay the cost of repairing or replacing the lost or damaged property;

3) Take all or any part of the property at an agreed or appraised value; or

4) Repair, rebuild or replace the property with other property of like kind and quality.

b. We will give notice of our intentions within 30 days after we receive the sworn statement of loss.

c. We will not pay you more than your financial interest in the Covered Property.

. . . .

7. **Valuation**

We will determine the value of Covered Property in the event of loss or damage as follows:

a. At actual cash value as of the time of loss or damage . . . .

The policy also included various "optional coverages," including replacement cost coverage, which Olson did not purchase. With respect to this coverage, the policy provided "Replacement Cost (without deduction for depreciation) replaces Actual Cash Value in the Loss Condition, Valuation, of this Coverage Form."

On June 12, 2002, the insured building was damaged by hail. The building was 42 years old at the time of the damage. Between

June 13 and 28, an employee of Interstate Structures, Inc., inspected and examined the building at Olson's request and determined that the cost for material, labor, and equipment to repair the hail damage would be $95,040.

Olson demanded payment from Le Mars for $94,540, representing the cost of repair less the $500 deductible. On July 18, a claims service prepared an adjuster summary for Le Mars in which it estimated total repair costs at $94,576 and deducted $36,710.40 from that total for depreciation, thereby arriving at an "ACV," or actual cash value, in the amount of $57,865.60. Le Mars thereafter claimed the actual cash value of the claim was $57,865.60 and offered Olson $57,365.60 (representing $57,865.60 less the $500 deductible), which he refused.

Olson filed a petition in the district court for Buffalo County seeking judgment against Le Mars in the amount of $94,540 and an attorney fee. The parties subsequently filed cross-motions for summary judgment. In support of his motion, Olson submitted the pleadings, a copy of the insurance policy, the adjuster's summary, his affidavit, and the affidavits of Dennis Land, a Nebraska general real estate certified appraiser, and the employee of Interstate Structures. In their affidavits, Land and Olson stated that shortly before the building was damaged, Land offered to purchase it from Olson for $200,000, and Olson made a counteroffer to sell for $225,000. Land had leased the building from Olson for the 3-year period prior to his offer and had extensive, full, and complete knowledge and information regarding the building. Land averred that he was still willing to pay $200,000 for the building immediately prior to the damage. In his affidavit, the certified appraiser stated that the building had a fair market value of $200,000 as of June 12, 2002, immediately prior to the hail damage. On September 1, Olson sold the building to Land in its damaged state for $100,000.

Le Mars submitted the affidavits of an underwriter employed by Le Mars and an analyst of market conduct regulatory compliance and coverage interpretation. The underwriter stated in his affidavit that it was "the standard and practice of the insurance industry to adjust a partial loss for property damage to the insured premises on a policy such as the one issued to [Olson] by reducing the actual cash value (cost to repair) by depreciation." He

opined that because the building was approximately 40 years old at the time of the loss and had a useful life of 100 years, it was appropriate for Le Mars to apply a 40-percent depreciation factor. The analyst stated in his affidavit that the "correct and only method for determining 'actual cash value' under [Olson's] policy is replacement cost less depreciation."

The district court granted summary judgment in favor of Olson, noting that the facts were generally undisputed and that the dispositive issue involved interpretation of the meaning of "actual cash value" as used in the policy. The court was not persuaded by Le Mars' experts, noting that the underwriter "defines actual cash value as cost to repair . . . then states that the insurance practice is to reduce actual cash value by depreciation" and that the analyst

> suggests that actual cash value must mean "replacement costs less depreciation." If the definition[s] of [Le Mars'] own experts are to have meaning one must also then conclude that cost of repair is synonymous with cost of replacement [and] must equate actual cash value with replacement costs absent a deduction for depreciation.

Opining that Le Mars was seeking to utilize "a special meaning and definition for actual cash value as a term of art in the insurance industry," the court held that actual cash value means fair market value, noting that the "determination of fair market value in of [sic] itself includes depreciation of the asset from its original value," and awarded Olson $99,500 to reflect the loss of fair market value to the building less the $500 deductible. Olson was allowed to amend his petition to conform to the evidence and the amount of damages awarded by the court.

## ASSIGNMENTS OF ERROR

Le Mars assigns, consolidated and restated, that the district court erred (1) in determining that actual cash value in the general loss provision of a property insurance policy means the market value of real property before and after a loss, rather than repair cost minus depreciation; (2) in failing to find that a deduction for depreciation upholds the terms of the policy as intended by the parties at the time of policy formation in this case; and (3) in making its determination as to actual cash value based on insufficient evidence.

## STANDARD OF REVIEW

■ Summary judgment is proper when the pleadings and evidence admitted at the hearing disclose that there is no genuine issue as to any material fact or as to the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law. *Dworak v. Farmers Ins. Exch., ante* p. 386, 693 N.W.2d 522 (2005); *Range v. Abbott Sports Complex, ante* p. 281, 691 N.W.2d 525 (2005).

■ When adverse parties have each moved for summary judgment and the trial court has sustained one of the motions, the reviewing court obtains jurisdiction over both motions and may determine the controversy which is the subject of those motions or make an order specifying the facts which appear without substantial controversy and direct such further proceedings as the court deems just. *Big River Constr. Co. v. L & H Properties*, 268 Neb. 207, 681 N.W.2d 751 (2004).

■ The meaning of an insurance policy is a question of law, in connection with which an appellate court has an obligation to reach its own conclusions independently of the determination made by the lower court. *Auto-Owners Ins. Co. v. Home Pride Cos.*, 268 Neb. 528, 684 N.W.2d 571 (2004); *Poulton v. State Farm Fire & Cas. Cos.*, 267 Neb. 569, 675 N.W.2d 665 (2004).

## ANALYSIS

Key facts are not in dispute. Olson's building was insured under the Le Mars policy when it was partially damaged by hail, which is one of the causes of loss covered by the policy. The cost of repairing the hail damage was $95,040. The dispute involves whether Le Mars is obligated under its policy to pay this entire amount, less Olson's deductible, or whether it is permitted to deduct a depreciation factor from the repair cost in order to arrive at a net amount due. Le Mars contends that because it insured the building for actual cash value, not replacement cost, the deduction of depreciation is proper.

■ Whether the policy permits this deduction is a question of law. In an appellate review of an insurance policy, the court construes the policy as any other contract to give effect to the parties' intentions at the time the writing was made. Where the terms of a contract are clear, they are to be accorded their plain

and ordinary meaning. *Auto-Owners Ins. Co. v. Home Pride Cos., supra*; *Poulton v. State Farm Fire & Cas. Cos., supra.* Regarding words in an insurance policy, the language should be considered not in accordance with what the insurer intended the words to mean but according to what a reasonable person in the position of the insured would have understood them to mean. *Guerrier v. Mid-Century Ins. Co.*, 266 Neb. 150, 663 N.W.2d 131 (2003); *Decker v. Combined Ins. Co. of Am.*, 244 Neb. 281, 505 N.W.2d 719 (1993).

### ACTUAL CASH VALUE

■ As used in a property insurance policy, the phrase "actual cash value" is a limitation on the amount of recovery for the protection of the insurer and not a substantive measure of damages. *Borden v. General Insurance Co.*, 157 Neb. 98, 59 N.W.2d 141 (1953); *Clouse v. St. Paul Fire and Marine Ins. Co.*, 152 Neb. 230, 40 N.W.2d 820 (1950); 12 Lee R. Russ & Thomas F. Segalla, Couch on Insurance 3d § 175:26 (1998). Where, as here, the policy does not include a specific definition, it has been noted that

there is a priority of rules to determine actual cash value as follows, (1) where market value is easily determined, actual cash value is market value, (2) if there is no market value, replacement or reproduction cost may be used, (3) failing the other two tests, any evidence tending to formulate a correct estimate of value may be used.

12 Russ & Segalla, *supra*, § 175:24 at 175-32, citing *Sullivan v. Liberty Mutual Fire Ins. Co.*, 174 Conn. 229, 384 A.2d 384 (1978).

■ We have directly addressed the meaning of "actual cash value" in the context of property insurance in two cases. In *Borden v. General Insurance Co., supra*, we held that the actual cash value of property "means the market value of it; that market value is the amount for which property may be sold by a willing seller who is not compelled to sell it to a buyer who is willing but not compelled to buy it." 157 Neb. at 113, 59 N.W.2d at 149-50. We further stated that in determining such value, the finder of fact "should consider the situation and condition of the property as it was at the time [of loss] and all other facts and circumstances shown by the evidence that affected or had a tendency to establish its value." *Id.* at 114, 59 N.W.2d at 150. We applied the

same definition to actual cash value, as used in a coinsurance clause, in *Erin Rancho Motels v. United States F. & G. Co.*, 218 Neb. 9, 352 N.W.2d 561 (1984). We were urged by the insurer in that case, as we are in this case by Le Mars, to adopt the "broad evidence rule," which permits a finder of fact to

> "consider every fact and circumstance which would logically tend to the formation of a correct estimate of the building's value, including the original cost, the economic value of the building, the income derived from the building's use, the age and condition of the building, its obsolescence, both structural and functional, its market value, and the depreciation and deterioration to which it has been subjected."

*Id.* at 14, 352 N.W.2d at 564-65, quoting *Messing v. Reliance Ins. Co.*, 77 N.J. Super. 531, 187 A.2d 49 (1962). While indicating that we had "no particular quarrel with that definition," we stated that

> actual cash value must still be measured as an economic unit, i.e., related to what, in terms of value, one could receive for his or her property. Fair market value is a term which has been used and is generally understood by experts and lay people alike, and which may be found by employing, if you will, the broad evidence rule. . . . We continue to approve that definition for "actual cash value" *wherever it is used in a policy of property damage insurance.*

(Emphasis supplied.) *Erin Rancho Motels v. United States F. & G. Co.*, 218 Neb. at 14, 352 N.W.2d at 565. Applying either a market value test or the broad evidence rule, there is undisputed evidence in this case that the value of the insured building as an economic unit, and therefore its actual cash value, was $200,000 immediately prior to the occurrence of the hail damage.

### DEPRECIATION DEDUCTION FROM COST OF REPAIR

Under the policy at issue in this case, Le Mars had four options for paying Olson's insured hail loss. It could have paid the value of the property, determined at actual cash value as of the time of loss. In the alternative, it could elect to pay the cost of repairing or replacing the damaged property; take all or any part of the property at an agreed or appraised value; or repair, rebuild, or replace the property with other property of like kind and quality. Because the policy gave Le Mars the right to select the payment

option, it effectively insured the property for the lesser of actual cash value or the cost to repair or replace the damaged property.

It is apparent from the record that Le Mars chose the second option, in that it calculated its proferred payment on the undisputed cost of repairing the partially damaged building. Le Mars argues that because the optional replacement cost coverage, which Olson did not purchase, is defined by the policy as being "without deduction for depreciation," it necessarily follows that the basic actual cash value coverage, for which a lower premium is charged, permits a deduction for depreciation from the cost of repair. This would be a persuasive argument if we were dealing with the total destruction of a building insured for an actual cash value determined solely on the basis of replacement cost. In that circumstance, application of a depreciation factor would serve to indemnify the insured for the value of that which was lost, but no more, and it would prevent the insured from receiving a windfall in the form of full replacement cost coverage for which no premium was paid.

In this case, however, we are presented with partial damage to a building which will be repaired, not replaced. The Le Mars policy does not specifically provide for a depreciation deduction in this circumstance. Cf. *Voges v. Mechanics Ins. Co.*, 119 Neb. 553, 230 N.W. 105 (1930). The evidence offered by Le Mars regarding standard loss adjustment practices in Nebraska is not useful in resolving the legal issue of whether deducting depreciation from repair costs is permissible under the language of this specific policy.

Cases from other jurisdictions can be found to support or refute the argument that depreciation should be deducted from repair costs under actual cash value coverage. In *Ins. Co. of North America v. City of Coffeyville*, 630 F. Supp. 166 (D. Kan. 1986), the court held that the insurer was entitled to deduct depreciation from the cost of repairing a structure partially damaged by fire. In that case, the insured did not purchase replacement cost coverage, which was defined as the full cost of repair or replacement and was not subject to a depreciation deduction, and the parties' prior course of dealing demonstrated that the insured shared the insurer's definition of actual cash value. See, also, *Zochert v. National Farmers Union Property*, 576 N.W.2d 531 (S.D. 1998)

(permitting deduction of depreciation from repair cost where policy differentiated between actual cash value and replacement cost coverages, and insured elected former).

On the other hand, the court in *Kane v. State Farm Fire and Cas. Co.*, 841 A.2d 1038, 1047 (Pa. Super. 2003), held that "in the absence of clear language to the contrary, an insurer may not deduct depreciation from the replacement cost" and that the phrase " 'actual cash value' may not be interpreted as including a depreciation deduction, where such deduction would thwart the insured's expectation to be made whole." The court concluded that "[w]here qualifying language is absent and an insured is promised 'actual cash value,' the insured is entitled to the cost to repair or replace the damaged property." *Id.* In *Glens Falls Ins. Co. v. Gulf Breeze Cottages*, 38 So. 2d 828, 830 (Fla. 1949), the Florida Supreme Court affirmed a chancellor's refusal to permit a depreciation deduction from the cost of repairing storm damage to insured structures, reasoning that "[i]f depreciation were allowed, it would cast upon the owner an added expense which we do not believe was contemplated by the parties when they entered into the insurance contract." See, also, *McIntosh et al. v. Hartford Fire Ins. Co.*, 106 Mont. 434, 78 P.2d 82 (1938) (holding that depreciation could not be deducted from cost to repair building to its condition prior to fire under actual cash value policy).

Most of the cases addressing this issue focus on the principle that an insured under an actual cash value policy is entitled to be indemnified for the actual amount of property loss, but should not be permitted to benefit from the loss. See, e.g., *Travelers Indem. Co. v. Armstrong*, 442 N.E.2d 349 (Ind. 1982) (agreeing that principle of indemnity is best served by considering evidence relevant to effect of over and under insurance); *Elberon Bathing Co. v. Ambassador Insurance Co.*, 77 N.J. 1, 8, 389 A.2d 439, 442 (1978) ("allowing pure replacement cost would violate the principle of indemnity by providing a windfall to the insured"). See, also, 6 John Alan Appleman & Jean Appleman, Insurance Law and Practice § 3823 (1972 & Cum. Supp. 2005). The parties in this case agree with this general principle, but disagree as to its application to these facts.

We agree with the district court that on the record presented, the policy did not permit the depreciation deduction

810

claimed by Le Mars. As we have previously determined, the insured building had an actual cash value of $200,000 at the time of the loss. In its damaged condition, its value was reduced to $100,000, the price for which Olson sold it to Land. Le Mars elected to calculate its payment under the policy based upon the cost of repairing the partial damage, which was $95,040. There is no evidence that the repairs would cause the actual cash value of the building to exceed $200,000. Recovery of the full repair costs without a depreciation deduction will therefore restore the value of the insured property that existed immediately prior to the loss, but will not enhance that value. Accordingly, we conclude that under an actual cash value policy which does not expressly provide otherwise, an insurer may not deduct depreciation from the cost of repairing partial damage to insured property where the actual cash value of the property, as repaired, does not exceed its actual cash value at the time of the loss.

Although we agree with the district court that Le Mars was not entitled to a deduction for depreciation, we disagree with its entry of judgment in the amount of $99,500. Le Mars' liability under its policy is limited to the repair cost of $95,040 less the insured's $500 deductible. Accordingly, we reduce the amount of the judgment to $94,540 and affirm as modified.

AFFIRMED AS MODIFIED.