Barber v. Stromberg-Carlson Telephone Mfg. Co.

FRANK W. BARBER, APPELLEE, v. STROMBERG-CARLSON
TELEPHONE MANUFACTURING COMPANY, APPELLANT.

FILED APRIL 23, 1908.   No. 15,162.

1. Contracts: ALTERATIONS: PRESUMPTIONS.  Where a contract pre-
pared by the use of a typewriter appears to have been changed
after the first impression is made, the presumption is that such
change was made before execution and delivery.

2. Corporations: CONTRACTS: AUTHORITY OF MANAGER.  The manager
of sales of a manufacturing corporation has power to direct and
contract in regard to the usual running business of selling its
wares, and persons contracting with such corporation are not
bound to know of a by-law thereof limiting the power of such
manager to make the customary contracts.

3. ———: ———: RATIFICATION.  Where a corporation ratifies or
knowingly accepts the benefits of a contract made by one of its
agents, it cannot repudiate the same on the ground that the
agent had no actual authority to execute such contract.

APPEAL from the district court for Franklin county:
ED L. ADAMS, JUDGE.  *Affirmed.*

*Dorsey & McGrew*, for appellant.

*Flansburg & Williams, contra.*

CALKINS, C.

The plaintiff brought action in the court below, alleg-
ing default in the performance of a contract in the words
and figures following: "Memorandum of agreement made
this 17th day of August, A. D. 1903, by and between Mr.
F. W. Barber, of Franklin, Neb., party of the first part,
and Stromberg-Carlson Telephone Manufacturing Com-
pany, party of the second part, witnesseth: The party of
the first part shall use his best efforts and in fact secure
for the party of the second part the contract for the cen-
tral office apparatus and telephones for the Home Tele-
phone Co., of Grand Island, Neb., said telephone exchange
to be built by Mr. J. F. Butterfield of the city of Chicago;

the price of said apparatus to be not less than $8,474.10, or the same as those specified under specifications submitted to Mr. J. F. Butterfield, of the city of Chicago, under date of August 10, '03. For and in consideration of the services rendered, the party of the second part hereby agrees to pay the party of the first part the sum of $625, less advances made by the party of the second part of $125, which said party of the first part agrees to pay to the party of the second part when the contract shall have been settled. It is understood and agreed ·by and between the parties hereto that this consideration shall be paid when the apparatus shall have been paid for either by the purchasing company or the contractor. It is further agreed by the parties hereto that said party of the second part has advanced the sum of $436 as expenses for the securing of the franchise in the city of Holdrege, Neb., and that, whereas the party of the first part is part owner of the franchise in the city of Holdrege for the construction and operation of a telephone exchange, and whereas said party of the first part is in negotiation with one J. F. Butterfield to dispose of said plant, it is hereby mutually agreed that, when said Butterfield shall have paid either to said party of the second part or the party of the first part the sum of $636, the valuation as placed upon the expenses as estimated as incurred in the securing of said franchise in the city of Holdrege, Neb., then said party of the second part shall pay to said party of the first part $200 of said expenses. It is further agreed verbally under this date that all agreements for commissions on Orleans, Alma, Bloomington and Riverton still remaining unpaid under the agreement of Nov. 10, '02, shall be computed up to August 15, and no further commissions shall be paid for extensions or additions to the above properties, and shall terminate the arrangement as of Nov. 10, '02. It is understood and agreed that the Reamsville matter shall also be covered by the agreement of Nov. 10, and shall terminate on the completion of the original contract. It is agreed that on future busi-

ness a separate agreement shall be made covering each individual case. In witness whereof the parties hereto have caused their seals and signatures to be attached this 17th day of August, A. D. 1903. (Seal.) F. W. Barber. (Seal.) Stromberg-Carlson Tel. Mfg. Co., by G. W. Stiger." The answer was a general denial, and upon the trial to the court there was a general finding and judgment for the plaintiff, from which the defendant appeals.

1. At the trial the defendant produced a paper, which appeared to be a carbon impression of the draft for the contract in question. It bore the signatures of both the plaintiff and Mr. Stiger. If the carbon impression produced by defendant was in fact made, as it appears to have been, by the same impression of the types as the ribbon copy produced by plaintiff, then the latter had been, after the duplicate impression had been made by the typewriter, altered by striking out the words, "G. W. Stiger of the," in the caption of the contract, and by inserting with the typewriter over the signature of Mr. Stiger the words, "Stromberg-Carlson Telephone Mfg. Co., by." The originals of these papers are attached to the record, from which it appears that, while both bear the genuine signatures of the plaintiff and Mr. Stiger, such signatures are not duplicates. The names of both the plaintiff and Mr. Stiger appear to be signed to the ribbon impression with a fine-pointed pen and with what presents the appearance of a grayish black ink, while the plaintiff's signature upon the carbon impression seems to have been made with a much coarser pen and blacker ink, and Mr. Stiger's signature to the latter was with a blue pencil. The plaintiff was called as a witness, and testifies that the ribbon copy is in the same condition as it was when delivered to him, but does not explain how the difference in the two copies occurred, nor the circumstances under which he signed the carbon impression. Stiger was not called as a witness, and the proof of the circumstances attending the signing of these papers rests, so far as oral testimony is concerned, upon the tes-

timony of the plaintiff. Upon these facts the defendant insists that the plaintiff and Stiger made the contract in question as individuals, and that the latter did not assume to act for the telephone company or on its behalf. The defendant's theory is that the physical evidence of the papers produced is sufficient to show that the difference between the ribbon and the carbon copy is owing to alterations made after its execution and delivery. Conceding that this would be the case if the signatures were in duplicate, or even if they appeared to have been attached at one and the same time, we think the difference in the signatures actually shown destroys any presumption that might otherwise exist that they were executed at one and the same time, and consequently any presumption that the ribbon copy was altered after it was executed. The physical evidence of the papers does show that the ribbon copy was changed after the duplicate impression was made by the typewriter; but it does not show, nor tend to show, that such changes were made after the signatures were attached and the papers delivered. The presumption of the law is that the changes were made before the execution and delivery of the papers. *Dorsey v. Conrad*, 49 Neb. 443. While the evidence of the plaintiff tends to support this presumption, there is no evidence whatever to overcome it.

2. The defendant further insists that, if Mr. Stiger did in fact assume to act for and make the contract in question in the name of the defendant, it was beyond the actual and apparent scope of his authority. Mr. Stiger was the defendant's manager of sales. We are not cited to any judicial definition of the authority of a manager of sales of a manufacturing corporation; but, since at common law the general manager of a corporation has power to direct and contract in regard to the usual running business of the corporation (2 Cook, Corporations (5th ed.), sec. 719), it would be fair to say that a manager of sales would have power to direct and contract in regard to the usual running business of selling its wares. In this

case the vital question is: Did the manager of sales have real or apparent authority to agree to pay commissions on orders for goods? To show his want of actual authority the defendant corporation introduced in evidence its by-laws, which provided that the president should execute all contracts, when authorized so to do by its board of directors, and that the treasurer should appoint and discharge all agents and employees, subject to the approval of the board of directors, and have the general management of its affairs. The rule that, where the charter provides that a corporate contract shall be signed by certain officers, instruments not so signed are unenforceable, is so harsh and inconvenient that it has been widely departed from and practically abandoned. 2 Cook, Corporations (5th ed.), sec. 725. Persons contracting with corporations are not bound to know of a by-law limiting the power of the agent to make the customary contracts appertaining to the business he is authorized to transact. 2 Cook, Corporations (5th ed.), sec. 725. The treasurer of the defendant was called, and testified concerning the contract in question: "I state that G. W. Stiger was not authorized to sign or execute any such contract." It is to be observed he did not deny that Stiger had authority to make the kind of agreement embodied in the contract, or, what would have been still more to the point, that Stiger had no authority to agree to pay commissions on orders for goods. The denial of Stiger's authority is directed to his competency to sign and execute this written contract, and may be simply the witness' construction of the law under the by-laws referred to. We think this testimony is not a denial of Mr. Stiger's authority to agree to pay to the plaintiff a commission in case he made the sale referred to in the contract. It further appears that Stiger had on several occasions made similar agreements to pay commissions on sales made by the plaintiff of the defendant's goods, and that defendant had from time to time paid such commissions.

3. There is evidence in the record sufficient to sustain

a finding that the defendant knew of the contract in the form that it appears upon the carbon impression in November, 1903, and before the closing of the Grand Island sale. The plaintiff produced a voucher for $200 "as portion of expenses incurred at Holdrege as per portion of agreement attached," and to this voucher is attached a typewritten copy of that part of the contract in question relating to expenses for securing the franchise in the city of Holdrege. The plaintiff testifies that he received these papers from the defendant's Rochester office, accompanied by a draft for $200 to his order, which draft was paid. If this is correct, then these papers must have passed through the defendant's auditing department, and it is hardly to be supposed that the voucher depending upon the contract, an extract from which was attached, would have been approved without any knowledge of the contract from which the extract purported to be taken. If the defendant ratified or knowingly accepted the benefits of the contract, it cannot now repudiate the same. *Brong v. Spence,* 56 Neb. 638; *United States School-Furniture Co. v. School District,* 56 Neb. 645.

In any view of the case, we think the decision of the trial court was fully supported by the evidence, and therefore recommend that its judgment be affirmed.

FAWCETT and ROOT, CC., concur.

By the Court: For the reasons stated in the foregoing opinion, the judgment of the district court is

AFFIRMED.