MINDEN STATE BANK, APPELLANT, V. W. B. SAWIN, APPELLEE.

FILED JULY 1, 1925.   No. 23210.

Bills and Notes:  TRIAL:  DIRECTION OF VERDICT.  "In a suit on an unpaid, past-due negotiable promissory note, it is error for the trial court to refuse a request for a peremptory instruction in favor of plaintiff, where the uncontradicted evidence of witnesses whose credibility is not questioned shows that plaintiff is a *bona fide* holder of the note, and that he purchased it for value before maturity without knowledge of any infirmity therein and of facts indicating bad faith in taking it." *Piper v. Neylon*, 88 Neb. 253.

APPEAL from the district court for Kearney county: WILLIAM A. DILWORTH, JUDGE. *Reversed.*

*C. P. Anderbery*, for appellant.

*Bruckman & Paulson, contra.*

Heard before MORRISSEY, C. J., DEAN, DAY, GOOD and EVANS, JJ., and REDICK, District Judge.

DEAN, J.

The Minden State Bank, plaintiff, sued in the district court for Kearney county to recover a judgment against W. B. Sawin, defendant, on two certain negotiable promissory notes, which were executed by defendant, in the sum of $1,000 and $2,000, respectively. The notes are both dated August 27, 1921, and by their terms draw interest at the rate of 7 per cent. per annum and became due six months after date. The notes are payable to the order of G. G. Withers and were by him indorsed and sold to the plaintiff bank before maturity. The following indorsement appears on both notes: "Demand, notice and protest waived. Payment guaranteed, G. G. Withers." Defendant recovered a verdict, and judgment thereon, and plaintiff appealed.

Defendant is a substantial and well-to-do farmer who has resided in Kearney county more than 30 years. He admits the execution and delivery of the notes to Withers, but he pleads that they were given for worthless lands in Colorado and that they are therefore without consideration. Following is a brief recital of the circumstances out of which this action arose:

Early in August, 1921, Mr. Sawin, and a Kearney county friend, named Franklin, accompanied by Mr. Withers, went to Alamosa, Colorado, with the object in view of buying or trading for land in Alamosa county. Upon arrival they were introduced to C. Carpenter by Mr. Withers, as a friend of his, and the party all drove together into the open country on a trip of inspection. Subsequently the quarter section of land was bought by defendant for which the notes in suit were executed. Sawin testified that Withers showed land to him, not far from the land in question, that yielded, per acre, about four tons of alfalfa and from two to seven hundred bushels of potatoes, and that wheat, oats and barley ground was pointed out that produced "tremendous yields," and that Withers and Carpenter said: "This land we are selling you is just as good as any of this other." And it so appeared to defendant at the time. But the soil ultimately turned out to be an alkali and gumbo formation and was worthless.

Before leaving Colorado defendant entered into an "exchange contract" with Withers and Carpenter for the purchase of the land. This contract was executed by "The Interstate Land and Mortgage Co., by C. Carpenter," on the part of the vendor, and Mr. Sawin signed as purchaser. The vendor, by the terms of the contract, agreed to sell the land to defendant, which was therein "valued at $9,600" and apparently, as an additional inducement, "fifty shares of the capital stock of the San Luis Canal Company" was included. The contract recites that the land was "free and clear of all incumbrances * * * except one certain (7 per cent. five year) trust deed in the sum of $11,000, dated August 12, 1921." Some of the consideration that passed

from Sawin to the vendor, as shown by the contract, consisted of "forty-eight shares of stock in the Basket Stores Company of Omaha, Nebraska," the trade price, as shown by the contract, being fixed at $4,500. Sawin also agreed to give the notes in suit and his check for $1,000. Elsewhere in the record it appears that Mr. Sawin was also the owner of some blocks of "Withers Painless Dental Company" stock, and it appears that he agreed to assign some of this dental stock to Withers in part payment for the land. But whether he did so does not clearly appear. He admitted, however, that the stocks of the "Basket Stores Company" and of the "Withers Painless Dental Company" were all practically valueless at the time, and that he was quite pleased to turn it all in to the vendors in the trade.

The plaintiff bank contends that it is a purchaser for value and before maturity and without knowledge of any infirmity in the notes. Arthur Jensen is its vice-president. He testified that he, as such officer, bought the notes for the bank from Withers, August 27, 1921, and that, when Withers asked him, he told him the rate of discount would be "6½ per cent. off the face;" that Withers was satisfied with this discount, and he thereupon bought the notes because he "knew Mr. Sawin was good for such an amount." He further testified that the discount in the transaction was the usual and customary bank discount at that time. It also appears that Withers had no connection with the bank and was practically a stranger, and that he gave Jensen no information in respect of the consideration for which the notes in suit were executed. The president of the bank testified that he did not know the consideration for which the notes were given, and he corroborated the evidence of Arthur Jensen in respect of the rate of discount which was charged and said that it was the usual and customary discount that prevailed in the purchase of notes at that time. To substantially the same effect was the evidence of the plaintiff bank's cashier and the assistant cashier.

Defendant complains because the bank made only one inquiry in respect of the note before purchasing, and that was to inquire if the signature of defendant Sawin was genuine, and that, upon being informed that such was the fact, the bank closed the transaction with Withers. But, in view of the facts herein, it is not without significance that defendant testified that he did not discover that the Colorado land in question was worthless until about two months after the notes were sold by Withers to the bank.

It appears from defendant's evidence that some time in October, 1921, he retraced his steps to Colorado, and that, upon inquiry and further examination, he then first discovered that he had been deceived and swindled by Withers and his friend Carpenter. But his evidence shows that when he first saw and obtained the land he thought he had made a profitable trade and that he continued to so believe until he made his return trip to Colorado. From the date of the making of the notes, namely, August 27, 1921, until he made this return trip, he frankly testified that he never once suspected that the land was valueless and that he had been defrauded. It also appears from his own evidence that he told all inquirers that he believed he had made a good trade and that the farm was a good deal for him. When asked if he would have so informed the bank if, before his return trip to Colorado, any of its officers had asked him about the land for which he gave the notes in suit, he frankly answered that he would. This was his language when he testified on this point:

"Q. If anybody inquired from you, you told them about the good soil out there in that San Luis valley? A. Yes, sir. Q. And that you had gotten a good deal? A. I don't know that I had told them I had gotten a good deal. It was in my mind that I had. Q. If they had asked you, you would have told them? A. Sure. Q. Then, if anybody had inquired from you, Mr. Sawin, up until October, you would have told them that, so far as you knew, you had a good deal? A. Yes sir. * * * Q. Then, Mr. Sawin, no matter if the bank had seen or heard or known of this transaction, you

would have told them; that you were not defrauded, up until October, when you saw this land? A. So far as I knew at that time. Q. Well, you would have told them that, wouldn't you? A. Sure."

The negotiable instruments act provides:

"To constitute notice of an infirmity in the instrument, or defect in the title of the person negotiating the same, the person to whom it is negotiated must have had actual knowledge of the infirmity or defect, or knowledge of such facts that his action in taking the instrument amounted to bad faith." Comp. St. 1922, sec. 4667.

We think that plaintiff, in view of the uncontradicted evidence, is not a purchaser in bad faith within the meaning of section 4667, above cited. In a comparatively recent case we said:

"In a suit on an unpaid, past-due negotiable promissory note, it is error for the trial court to refuse a request for a peremptory instruction in favor of plaintiff, where the uncontradicted evidence of witnesses whose credibility is not questioned shows that plaintiff is a *bona fide* holder of the note, and that he purchased it for value before maturity without knowledge of any infirmity therein and of facts indicating bad faith in taking it." *Piper v. Neylon*, 88 Neb. 253.

When the taking of evidence was concluded, plaintiff moved for a directed verdict. The motion was overruled. We conclude that the court erred in its ruling. The judgment is therefore reversed and the cause remanded.

REVERSED.