HARRY GEYER, APPELLEE, v. THE WALLING COMPANY, APPELLANT.

122 N. W. 2d 230

Filed June 21, 1963. No. 35430.

Gaines, Spittler, Neely, Otis & Moore and William B. Woodruff, for appellant.

Haney, Walsh & Wall, for appellee.

Heard before WHITE, C. J., CARTER, MESSMORE, YEAGER, SPENCER, BOSLAUGH, and BROWER, JJ.

SPENCER, J.

This is an appeal by The Walling Company from a judgment entered on a verdict for Harry Geyer on three trade acceptances executed in its name by G. B. Abart, vice president.

While other points are raised, the basic question involved herein is the authority of a vice president to execute trade acceptances for the defendant corporation.

The Walling Company, defendant and appellee, which will hereinafter be referred to as defendant, is a manufacturer's representative for plant equipment used by utility companies. R. A. Walling, its president, testified as follows with reference to his knowledge of the contract signed by G. B. Abart which resulted in the issuance of the trade acceptances: " 'Q. At what point did you become aware of the contract entered into by Mr. Abart on behalf of the corporation with Aluma-Glo? A. As I recall, Gail (G. B. Abart) and Morris (Mr. Greer) came to me and told me about this product and I do quite a little traveling, so that I am not around all the time, and asked me what I thought about it and as I recall, my comment was that it seemed to be a little bit out of their particular line of effort, but I knew that we had problems in protective coating, protecting mechanical equipment, such as coating some of Gail's stuff that stands out in the weather, and if they felt this was a product that would help them, that we could try it as far as I was concerned. I said we might take a look at it and try it.' Page 9 line 6. 'Q. Do you recall whether that was before or after Mr. Abart signed the contract? A. I couldn't say specifically. I expect

it was before or about the same time. Q. And you authorized the entering into the contract or ratified it? A. I agreed before that if they felt it was a good thing that they could try it out, yes, and see what it looked like. I don't recall if there was any discussion of a contract or anything at that time.' Line 23. 'Q. In any event, it was all right with you that they go ahead? A. As long as they didn't expect me to sell it.' "

G. B. Abart, who was a vice president and a director of the defendant, testified that he signed a contract with Aluma-Glo Corporation for the purchase of protective coating for machinery. When he was questioned about the trade acceptances, Abart, who had a mechanical engineering degree from the University of Kansas, was extremely evasive. He could not remember signing them, and while he did not deny the signature thereon was his signature, neither would he admit it was. The most he would say was that it looked like his signature.

Harry Geyer, hereinafter referred to as plaintiff, filed the following request for admissions on April 24, 1961: "Comes now the plaintiff herein and requests the defendant to admit within ten days of the date of service hereof the truth of each of the following statements.

"I   That the signatures of G. B. Abart appearing on the originals of the Trade Acceptances, copies of which are attached to plaintiff's Petition, are genuine.

"II   That on the date of signing the said original Trade Acceptances, the said G. B. Abart was Vice-President of the Walling Company, a corporation.

"III   That the written words 'The Walling Co.' appearing after the printed words 'Buyer's Signature' on each of the said original Trade Acceptances were placed on the said Trade Acceptances by G. B. Abart.

"IV   That the written words 'G. B. Abart V. P.' appearing after the printed words 'By Agent or Officer' on each of the said original Trade Acceptances were

placed on said Trade Acceptances by G. B. Abart."

Objections were filed by the defendant. After a hearing, the objections were overruled and the defendant was directed to make due answer to the questions submitted. No answers were ever supplied by the defendant. For the purposes of this case, the requests stand admitted. § 25-1267.41, R. R. S. 1943.

The trade acceptance, payable January 15, 1960, is as follows:

"ALUMA-GLO CORPORATION OF AMERICA
1938 Harrison St.                         Hollywood, Florida
No. ———                                   12 Nov. 1959
To   The Walling Co.   1514 Davenport, Omaha, Neb.
On   15 January 1960   Pay to the order of ALUMA-GLO CORPORATION OF AMERICA   Four-Hundred-Ninety & 47/100 ____ Dollars ($490.47)
The transaction which gives rise to this instrument is the purchase of goods by the acceptor from the drawer.

Accepted at   Omaha, Neb.   on )    ALUMA-GLO
Nov 12 1959                       )   CORPORATION
Payable at   Northside Bank  Bank )   OF AMERICA
Bank Location   Omaha, Neb.       )   By Joel S. Lewis
Buyer's Signature   The Walling Co. )     President"
By Agent or Officer  G B Abart V. P. )

The other two are exactly the same except that one of them is payable February 15, 1960, and the other one is payable March 15, 1960, and is in the amount of $490.46.

The evidence is undisputed that the plaintiff purchased the trade acceptances in good faith, in due course of trade, before they were due, for a valuable consideration, and without notice of any infirmities. They were endorsed to the plaintiff November 25, 1959, for full value less 6 percent discount. In other words, plaintiff paid 94 percent of their face value for them.

Section 62-156, R. R. S. 1943, provides as follows: "To constitute notice of an infirmity in the instrument, or defect in the title of the person negotiating the same,

the person to whom it is negotiated must have had actual knowledge of the infirmity or defect, or knowledge of such facts that his action in taking the instrument amounted to bad faith."

Section 62-157, R. R. S. 1943, is as follows: "A holder in due course holds the instrument free from any defect of title of prior parties, and free from defenses available to prior parties among themselves, and may enforce payment of the instrument for the full amount thereof against all parties liable thereon."

It appears to be defendant's position that this transaction is covered by section 62-123, R. R. S. 1943, which has been our law since 1905 and is as follows: "Where a signature is forged or made without authority of the person whose signature it purports to be, it is wholly inoperative, and no right to retain the instrument, or to give a discharge therefor,. or to enforce payment thereof against any party thereto, can be acquired through or under such signature, unless the party against whom it is sought to enforce such right is precluded from setting up the forgery or want of authority."

Defendant in its brief argues as though the signatures to the trade acceptances were forgeries. This clearly is not the case. We interpret defendant's argument to be that the signatures for the corporation were attached by an officer who did not have authority to execute the instruments, that it is covered by section 62-123, R. R. S. 1943, and that it is not incumbent on the defendant to prove that plaintiff was not a holder in due course. We further assume that defendant's position is that the plaintiff had notice of an infirmity because the notes were signed by a vice president on behalf of the corporation, and were not accompanied by a corporate resolution authorizng their execution.

The 1909 case of Second Nat. Bank v. Snoqualmie Trust Co., 83 Neb. 645, 120 N. W. 182, in which a verdict was directed for the plaintiff, appears to be the only case considered by this court containing facts at all

similar to the instant case. In that case, a corporate promissory note was given, signed only by the secretary. The defense was that the person signing the note was not properly authorized to do so by the corporation. That case, at page 648, reads: "So far as the record discloses, none of the officers, nor all combined, were specifically authorized to execute a negotiable instrument in its name. However, the power to contract necessarily involves the power to create a debt, and, as said by Mr. Justice Gordon in Watt's Appeal, 78 Pa. St. 370, 391: 'A corporation, without such power would be a body without life, utterly effete and worthless.' Richmond, F. & P. R. Co. v. Snead & Smith, 19 Grat. (Va.) 354, 100 Am. Dec. 670. And the record being silent as to the agencies provided by defendant for the exercise of this very essential function, we must look to the facts in the particular instance unenlightened by information concerning its usual course of business in such transactions."

We held in that case that the holder of the instrument who took it before maturity without notice of any defect was a purchaser for value in due course of business. As suggested, the note was signed for the corporation by the secretary. This fact was not sufficient to require the purchaser to make inquiry as to the secretary's authority. We believe that decision is controlling on the facts herein.

There is in the instant case no contention that the issuance of trade acceptances was an ultra vires act of the corporation. A corporation may draw or accept a bill of exchange for the purposes of its business. 4 Cook on Corporations (8th ed.), § 761, p. 3387. The nature of the corporation was such that the right to execute negotiable paper must be presumed in the absence of evidence otherwise. For cases holding trade acceptances in the form of the instant ones to be negotiable instruments, see cases on page 263, Beutel's Brannan Negotiable Instruments Law (7th ed.). Defendant's com-

plaint is that the plaintiff has not shown that the vice president had actual authority to execute the trade acceptances on behalf of the corporation. Defendant, however, does admit that the vice president did have authority to order merchandise and to execute purchase orders in the area in which he represented the corporation. It is also admitted in the following testimony of the president of defendant corporation that Abart, the vice president, was specifically authorized to contract in this instance if he and a Mr. Greer were agreed that the product which was the subject of the trade acceptances "was a good product and that we needed it in our business, that it was satisfactory with me for them to take a try at it."

This is not the usual case which reaches the courts where the vice president was contracting for his own benefit. In this instance, the vice president was contracting for the corporation on an item within his particular area in the corporation with the knowledge and consent of the president of the corporation, which item at least two of the directors of the corporation, Abart and Greer, must have felt was beneficial to the corporation. Further, the plaintiff paid full value for the instruments, before maturity, in good faith, and without notice of any infirmity.

We find this case is within the ambit of the holding in Second Nat. Bank v. Snoqualmie Trust Co., 83 Neb. 645, 120 N. W. 182. We find nothing in the evidence which required an investigation by the plaintiff to ascertain whether the execution of the trade acceptances was authorized. The general rule in other jurisdictions is stated in 10 C. J. S., Bills and Notes, § 506h, p. 1116, as follows: "Where a private corporation has power to issue negotiable paper * * * and the corporation's officer or agent by whom an instrument was executed, accepted, or indorsed had apparent authority to perform such act, the fact that such officer or agent did not have actual authority to perform such act, or that the instru-

ment was unauthorized, although not absolutely prohibited by statute, for the particular purpose for which it was executed, accepted, or indorsed, or that the proceeds were misapplied or misappropriated by such officer or agent, is not a defense as against a bona fide holder of the instrument, the theory being that such holder has the right to presume that the instrument was issued under circumstances which gave the requisite authority."

To hold as defendant contends would be to put a strained construction on the Negotiable Instruments Act. It would also require us to overrule Second Nat. Bank v. Snoqualmie Trust Co., *supra,* which has been the law of this jurisdiction since 1909. To require one purchasing commercial paper, which is regular on its face and for which full value is paid, to first investigate the charter of the issuing corporation to ascertain the authority of the officer who has apparent authority to contract, at the very least would unduly burden commercial transactions. We do not believe that where a transaction appears regular on its face that a purchaser for value is bound at his peril to be suspicious.

This determination is not without support in several Nebraska cases involving principal and agent, which, while not analogous, at least indicate support for the principle involved. An act of an agent, although without actual authority from his principal, may be with such apparent authority as to bind the principal. Union Pacific R. R. Co. v. Gregory Coal Co., 103 Neb. 421, 172 N. W. 362. Such apparent authority of the agent cannot be extended or restricted by by-laws or other instructions to the agent by the principal, in the absence of actual notice thereof. Sindelar v. Hord Grain Co., 116 Neb. 776, 219 N. W. 145.

In Barber v. Stromsberg-Carlson Telephone Mfg. Co., 81 Neb. 517, 116 N. W. 157, 129 Am. S. R. 703, 18 L. R. A. N. S. 680, we held: "The manager of sales of a manufacturing corporation has power to direct and contract

in regard to the usual running business of selling its wares, and persons contracting with such corporation are not bound to know of a by-law thereof limiting the power of such manager to make the customary contracts." In that case, the by-laws required all contracts to be executed by the president when authorized to do so by the board of directors. We said as follows: "The rule that, where the charter provides that a corporate contract shall be signed by certain officers, instruments not so signed are unenforceable, is so harsh and inconvenient that it has been widely departed from and practically abandoned. 2 Cook, Corporations (5th ed.), sec. 725. Persons contracting with corporations are not bound to know of a by-law limiting the power of the agent to make the customary contracts appertaining to the business he is authorized to transact. 2 Cook, Corporations (5th ed.), sec. 725." A corporation can act only by its agents, and the presumption is that an act pertaining to its ordinary business when performed by an officer who could ordinarily transact such business is legally done and is binding on the corporation. See Electronic Development Co. v. Robson, 148 Neb. 526, 28 N. W. 2d 130.

At the conclusion of the evidence, plaintiff moved for a directed verdict because the uncontradicted evidence showed plaintiff to be a holder in due course. This was overruled. Plaintiff then tendered an instruction requesting a directed verdict. This the court refused to give. The court submitted the question of whether plaintiff was a holder in due course to the jury as well as the question of the execution of the instruments and the authority of the vice president to execute them for the corporation. It was stipulated that at the time the trade acceptances were presented at the bank they were dishonored. The jury rendered a verdict for the plaintiff. There is no error in this record of which the defendant can complain.

The plaintiff's motion for a directed verdict should

have been sustained. It- is the law of this jurisdiction that in a suit on an unpaid, past-due negotiable instrument it is error for the trial court to refuse a request for a peremptory instruction in favor of plaintiff where the uncontradicted evidence shows plaintiff to be a bona fide holder who purchased the instrument for value before maturity without knowledge of any infirmity therein or of facts indicating bad faith in taking it. See, Piper v. Neylon, 88 Neb. 253, 129 N. W. 277; Minden State Bank v. Sawin, 113 Neb. 691, 204 N. W. 793.

For the reasons given, the judgment of the trial court should be and hereby is affirmed.

AFFIRMED.