IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| GB AUCTIONS, INC., a Washington corporation, | ) ) ) | No. 31667-0-III |
| Respondent, | ) ) ) | |
| v. | ) ) | UNPUBLISHED OPINION |
| PRIVATE LEDGER, INC., a Nebraska corporation, | ) ) ) | |
| Appellant. | ) ) | |

KORSMO, J. — Private Ledger, Inc. (PLI) appeals a declaratory judge determining that GB Auctions, Inc. (GBA) had not breached its contract with PLI. Believing that disputed questions of fact exist, we reverse and remand for trial.

### FACTS

In 2010, GBA contacted PLI about selling GBA's airplane. The two businesses exchanged communications back and forth, but GBA ultimately decided that it was not ready to sell its airplane. All of these communications occurred between Adam Frisbie (PLI's owner) and Mark Muelheim (GBA's pilot).

Later in 2010, Mr. Muelheim, acting on GBA's behalf, reinitiated contact with PLI. On February 17, 2011, the two parties entered into an aircraft sale and listing agreement. Mr. Frisbie signed on behalf of PLI and Greg Mahugh, GBA's vice president,

signed on behalf of GBA. Mr. Muelheim and GBA's president Bob McConkey were also present for the signing. The parties set the selling price at $1,900,000. PLI had exclusive listing rights for the sale.

The parties scheduled the listing agreement to expire after 90 days. However, it would automatically renew for successive 90-day periods until one of the parties gave at least two weeks' notice in writing that the agreement would not be renewed for another term.

If GBA cancelled in midterm, the agreement provided that it would have to pay PLI's commission.[1] GBA would also have to pay the commission if PLI secured a valid offer within the asking price, regardless of whether GBA actually accepted the offer and sold the airplane. The agreement also required GBA to provide PLI with all information regarding the aircraft and its equipment and to provide PLI with all documents relating to the aircraft's maintenance status.

The first two 90-day terms came and went without any offers. On August 25, 2011, shortly after entering the third 90-day term, PLI sent an e-mail to Mr. Muelheim asking for updated log books and an updated status sheet for the airplane. PLI also stated that

---

[1] The critical sentence is found in the third paragraph of the listing agreement: "Failure to close after receipt of a valid offer *or* early termination of this agreement will trigger the sales commission due at asking price." Clerk's Papers at 8 (emphasis added).

inquiries about the airplane had been increasing dramatically. PLI did not immediately hear back from GBA.

On August 29, Mr. Muelheim replied to PLI and explained that GBA's response had been delayed because he, Mr. Muelheim, had to first consult with Mr. McConkey. Instead of providing PLI with the requested documentation, GBA's response informed PLI that "[t]he decision now is to pull the airplane from the market." CP at 83. The response, written by Mr. Muelheim, goes on to tell Mr. Frisbie that he enjoyed their working relationship and that he does not want to say goodbye for good, but that he does not know when or if they will meet again.

During this same time period, GBA was engaged in negotiations with Elliot Aviation to make substantial upgrades to the airplane. On August 14, prior to GBA communicating to PLI its decision not to sell, Mr. Muelheim informed Elliot Aviation that his boss had already made the decision not to sell the airplane. A few months later, GBA and Elliot entered into a contract to make $272,100 worth of upgrades to the airplane.

Not sure how to interpret Mr. Muelheim's August 29 reply, PLI sent another e-mail on August 30, asking GBA to confirm that it was terminating the listing agreement early or if PLI could still pursue inquiries that had already been made. Mr. Muelheim's answer did not substantially clarify the parties' relationship. He responded that it was up to PLI to decide if it wanted to follow up on existing inquiries, but that procuring an offer "would certainly test [Mr. McConkey's] resolve." CP at 91.

3

Instead of treating GBA's decision not to sell as an early termination of the contract, it appears from the record that PLI continued its efforts to secure an offer. On September 20, 2011, PLI wrote to Mr. Muelheim that the airplane continued to receive inquiries, and that the airplane would be likely to sell once GBA adjusted the price to account for the flight time that the airplane had accrued over the last seven months.

That same day, Mr. Muelheim consulted with Mr. McConkey about PLI's most recent e-mail. Mr. Muelheim then forwarded to PLI Mr. McConkey's answer, which Mr. Muelheim quoted Mr. McConkey as saying, "'don't think we are interested in selling at thus [sic] time at all.'" CP at 94.

On September 29, PLI followed up by asking whether it should renew its advertisements for another month or pull them. From the record before this court, it appears that GBA never responded.

On October 19, 2011, PLI sent an e-mail to Mr. Muelheim asking for its commission under the listing agreement's early cancellation clause. The next day, Mr. Mahugh sent PLI a letter in which he claimed that GBA did not terminate the listing agreement and that Mr. Muelheim lacked authority to modify the listing agreement in any way. Mr. Mahugh also announced GBA's decision not to renew the contract for another term, which was set to expire on November 14, 2011. PLI responded that it had been led to believe this whole time that Mr. Muelheim acted with authority on GBA's behalf.

After that, the parties continued to correspond in an attempt to resolve the matter. On November 30, Mr. McConkey sent PLI an e-mail in which he stated that he had in fact directed Mr. Muelheim to have PLI "'take it off the market.'" CP at 80. Mr. McConkey also expressed his opinion that the decision to pull the airplane from the market was not intended to imply a cancellation of the listing agreement or that GBA would not honor a valid offer during the remaining listing period.

On December 15, 2011, GBA preemptively sued PLI, seeking declaratory judgment. PLI answered and counterclaimed with causes of action for breach of contract and unjust enrichment. Shortly thereafter, GBA moved for declaratory judgment. It argued that the agreement was properly cancelled in writing prior to the conclusion of the third term and that no commission was owed because PLI never generated an offer. PLI in turn argued that it was entitled to a commission because GBA breached the agreement prior to cancelling it.

On April 12, 2013, the trial court entered an order granting GBA's motion for declaratory judgment. In its order, the court made five mixed findings: (1) the agreement was in its third term, (2) the agreement could be terminated with written notice at least two weeks before the end of the term, (3) GBA gave written notice of its intent to terminate the listing at least two weeks before the expiration of the third term, (4) the contract terminated upon expiration of the third term, and (5) no commission is due because PLI did not

generate an offer before the expiration of the third term. PLI thereafter timely appealed to this court, challenging the trial court's findings.

## ANALYSIS

This appeal presents two questions. The first is whether the trial court erred when it entered declaratory judgment for GBA. If so, the second is whether PLI is entitled to attorney fees on appeal.

Before addressing the merits of this case, this court must determine what law to apply. The listing agreement contained a choice of law provision designating Nebraska law as controlling. Washington generally respects choice of law provisions. *Schnall v. AT&T Wireless Serv., Inc.*, 171 Wn.2d 260, 266-67, 259 P.3d 129 (2011).

Despite the presence of a choice of law provision, the forum state usually still applies its procedural law. RESTATEMENT (SECOND) OF CONFLICTS OF LAW ch. 6 intro. note (1971). Notably, Nebraska also follows this rule. *Nebraska Nutrients, Inc. v. Shepherd*, 261 Neb. 723, 780, 626 N.W.2d 472 (2001). Accordingly, this court will apply Nebraska substantive law and Washington procedural law.

This court reviews declaratory judgment actions the same as it does any other civil case. *To-Ro Trade Shows v. Collins*, 144 Wn.2d 403, 410, 27 P.3d 1149 (2001). Because GBA submitted its motion based on the parties' declarations and documents in the record, instead of proceeding to trial, we will review this appeal the same as we would review a grant of summary judgment.

"When reviewing an order for summary judgment, the appellate court engages in the same inquiry as the trial court." *Mountain Park Homeowners Ass'n, Inc. v. Tydings,* 125 Wn.2d 337, 341, 883 P.2d 1383 (1994). "This court will affirm summary judgment if no genuine issue of any material fact exists and the moving party is entitled to judgment as a matter of law." *Id.* "All facts and reasonable inferences are considered in the light most favorable to the nonmoving party, and all questions of law are reviewed de novo." *Id.* "But a question of fact may be determined as a matter of law when reasonable minds can reach only one conclusion." *Miller v. Likins,* 109 Wn. App. 140, 144, 34 P.3d 835 (2001).

Applying this standard, we believe that the trial court erred as a matter of law by not viewing the evidence in the light most favorable to the nonmoving party. Doing so reveals a genuine issue of material fact as to whether GBA repudiated the listing agreement on August 29, on September 20, or after September 29.

Generally speaking, "the question whether there has been repudiation or whether repudiation was justified is a question of fact for the jury." *Radecki v. Mutual of Omaha Ins. Co.,* 255 Neb. 224, 233, 583 N.W.2d 320 (1998). Repudiation can be proven through words or acts evincing an intention to refuse performance. *Chadd v. Midwest Franchise Corp.,* 226 Neb. 502, 508, 412 N.W.2d 453 (1987).

In the above communications, we note that GBA repeatedly stated its intent not to sell the airplane. Because GBA had a contractual duty to pay the commission upon receipt

of an offer, as opposed to upon sale of the airplane, the fact that GBA did not want to sell the airplane is not necessarily conclusive evidence of GBA's intent to refuse performance.

However, GBA's communications did more than just show its intent not to sell the airplane. The August 29 e-mail from Mr. Muelheim shows an unmistakable intent to cancel the entire relationship with PLI, considering the e-mail's great uncertainty about when or if the parties would ever communicate with each other again. This inference is strengthened by the fact that the August 29 e-mail was in response to a request for documentation that GBA had a positive duty to provide under the contract, and which GBA never provided. The lack of this documentation would naturally hinder PLI's ability to sell the airplane. Thus, a rational trier of fact could find that GBA repudiated the listing agreement on August 29.

PLI's conduct after the August 29 e-mail raises another genuine issue of material fact as to whether PLI chose instead to waive any repudiation by GBA. Even then, a rational trier of fact could find that GBA's September 20 response was a further repudiation.[2]

---

[2] GBA counters that PLI repudiated the contract when it requested a reduction in the selling price, which GBA argues shows PLI's inability or unwillingness to perform. However, the record shows that PLI's one request to reduce the asking price was in response to GBA adding 350 hours of flight time to the airplane during the intervening months. It is hard to imagine how adding a significant amount of wear and tear to the airplane during those months would not materially depreciate the airplane's value. Furthermore, GBA's instructions to pull the airplane from the market effectively prohibited PLI from procuring an offer. A seller cannot be expected to find a buyer without the ability to advertise that the airplane is for sale.

Taken in the light most favorable to the nonmoving party, this e-mail further supports the proposition that GBA already considered the contract to be cancelled.

GBA's silence after September 29 is also evidence of repudiation by GBA. At that time, the third listing term was only half way through. When viewed in the light most favorable to PLI, GBA's silence despite PLI's request for further direction could be viewed as a repudiation. Indeed, PLI treated these last events as a repudiation as shown by its demand for payment and cessation of advertising activities.

The trial court found that GBA properly gave at least two weeks' written notice that GBA would not renew the listing agreement for another term. However, it only gave notice *after* PLI gave notice that it was treating GBA's actions as a repudiation of the listing agreement. If GBA's prior actions are eventually found to constitute a repudiation of the listing agreement, then GBA's attempt to end the contract at the end of the third term is irrelevant. By that time, PLI had already changed its position in reliance on GBA's repudiation by ceasing its advertising activities mid-way through the third term.

GBA also argues that it could not have repudiated the contract because Mr. Muelheim did not have authority to represent GBA. This argument lacks merit.

"The scope of an agent's authority is a question of fact." *Oddo v. Speedway Scaffold Co.*, 233 Neb. 1, 6, 443 N.W.2d 596 (1989). "In the relationship of principal and agent, an agent's actual authority is the power to act on the principal's behalf in accordance with the principal's consent to the agency." *Id.* at 6-7. "Apparent or

ostensible authority may be conferred if the alleged principal affirmatively, intentionally, or by lack of ordinary care causes third persons to act upon the apparent agency." *Draemel v. Rufenacht, Bromagen & Hertz, Inc.*, 223 Neb. 645, 651, 392 N.W.2d 759 (1986).

The record in this case shows that Mr. Muelheim did not have actual authority to make decisions on GBA's behalf. This is shown by the fact that Mr. Muelheim did not sign the listing agreement and by his repeated statements that he had to check with his principal. However, the lack of authority to make decisions does not affect Mr. Muelheim's authority to communicate decisions made by his principal.

Under Nebraska law, liability of a principal for an agent's acts does not stem solely from an agent making binding decisions on the principal's behalf. A principal may still be held liable for misrepresentations of fact made by an agent on the principal's behalf. *Willard v. Key*, 83 Neb. 850, 120 N.W. 419 (1909) (agent's misrepresentation of acreage, which induced the injured party to buy real estate from the principal). Such misrepresentations could include an agent's misrepresentation of a decision made by his principal.

Throughout the parties' relationship, GBA put Mr. Muelheim forward as its point of contact. Anything that Mr. McConkey and Mr. Mahugh needed to tell PLI was relayed through Mr. Muelheim. PLI similarly relayed its messages back through Mr. Muelheim. Because of GBA's actions, PLI was in a position to reasonably believe that an e-mail from

Mr. Muelheim was as good as an e-mail from Mr. McConkey. If Mr. Muelheim was powerless to relay binding decisions made by his principals, then GBA needed to give PLI actual notice of that limitation, instead of putting Mr. Muelheim forward as the speaker for his principal. *Geyer v. Walling Co.*, 175 Neb. 456, 463, 122 N.W.2d 230 (1963).

Accordingly, we believe that there are factual questions presented that require a trial to determine whether or not GBA breached the agreement prior to cancelling it.[3]

PLI asks for its attorney fees under the listing agreement. "Nebraska law deems the recovery of attorney fees in the action in which they are incurred to be a procedural issue governed by the law of the forum." *Nebraska Nutrients, Inc. v. Shepherd*, 261 Neb. 723, 782, 626 N.W.2d 472 (2001), *abrogated on other grounds by Sutton v. Killham*, 285 Neb. 1, 5, 825 N.W.2d 188 (2013). Accordingly, Washington law applies with respect to attorney fees under the contract.[4]

The contract here states: "If action is instituted to collect compensation or commissions, Client agrees [to] pay such sums as the court may fix such as reasonable attorney fees in addition to all damages or relief sought by PLI." CP at 9. Using the

---

[3] We also note that the trial court (Finding of Fact 5) ignored PLI's basis for seeking a commission—the alleged breach of the agreement creating an early termination of the contract—in favor of GBA's theory that no offer had been presented. The evidence should have been examined in light of the theory of recovery being pursued rather than a theory that was not.

[4] RCW 4.84.330 makes a unilateral fee provision bilateral. Accordingly, the statute would allow either side to claim attorney fees under this provision.

No. 31667-0
*GB Auctions, Inc. v. Private Ledger, Inc.*

permissive "may," this provision puts the decision to award attorney fees in the court's discretion. Considering that this case presented a debatable issue for both sides and that the matter has not been resolved on the merits, we choose to adhere to the default American Rule and decline to award PLI attorney fees on appeal.

Reversed and remanded.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Korsmo, J.

WE CONCUR:

_____
Brown, A.C.J.

_____
Fearing, J.