DALE BROWN AND DONNA BROWN, HUSBAND AND WIFE, APPELLEES, V. FARMERS MUTUAL INSURANCE COMPANY OF NEBRASKA, A NEBRASKA CORPORATION, APPELLANT.

468 N.W.2d 105

Filed April 12, 1991.   No. 89-130.

Leland K. Kovarik, of Holtorf, Kovarik, Nuttleman, Ellison, Mathis & Javoronok, P.C., for appellant.

Steven C. Smith, of Van Steenberg, Chaloupka, Mullin, Holyoke, Pahlke, Smith, Snyder & Hofmeister, P.C., for appellees.

HASTINGS, C.J., WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ., and COLWELL, D.J., Retired.

FAHRNBRUCH, J.

Farmers Mutual Insurance Company of Nebraska (Farmers) appeals a $16,636.70 jury verdict which determined that sheep owned by Dale and Donna Brown were stolen and that the loss was, therefore, covered under the theft provisions of an insurance policy issued to the Browns by Farmers. We affirm.

Farmers' six assignments of error combine to allege that the trial court erred in (1) overruling Farmers' motion for a directed verdict, (2) failing to give a requested instruction, (3) permitting two law enforcement officers to testify that a livestock thief or thieves were operating in Dawes County, (4) permitting testimony of a decrease in wool subsidy payments and allowing

the jury to include such amount in its verdict when the policy covered only "direct loss to insured farm personal property," and (5) not applying the applicable $100 deductible to each theft proven. The fifth assignment of error is not discussed in Farmers' brief. "Errors assigned but not discussed in an appellant's brief are not considered by this court. [Citations omitted.]" *Horst v. Johnson, ante* p. 155, 156, 465 N.W.2d 461, 462 (1991). We, therefore, will consider only the first four assignments of error listed above.

In an action at law, the Supreme Court views the evidence in the light most favorable to the prevailing party. *McCune v. Neitzel*, 235 Neb. 754, 457 N.W.2d 803 (1990). In the light most favorable to the plaintiffs, the record reflects the following:

The Browns operate a farm/ranch in Dawes County, consisting of approximately 1,400 acres upon which they graze approximately 400 to 500 head of ewes. Before their annual sale, the Browns also raise 400 to 500 lambs. The Browns further maintain 3 rams for every 100 ewes. At the time of trial, the Browns had been engaged in the sheep-raising business for 25 years.

The sheep were kept in two pastures which were north of the Browns' home and which were designated at trial as the west pasture and the north pasture. The west pasture was completely enclosed by a fence. Fencing surrounded the north pasture, except where it was bounded by a large, deep canal and Lake Whitney. The fence extended to a point where the depth of the lake was 4 feet, and the fence was lengthened or shortened to coincide with changes in the lake's water level.

The fences enclosing the sheep were 36-inch woven wire topped by three strands of barbed wire. The total height of the fences was 4½ to 5 feet. The fenceposts were constructed of steel. There was testimony that the fences were regularly repaired and rebuilt. Dale Brown (Brown) checked the fences numerous times each day. The fence gates were constructed in the same sheep-tight fashion as the fences, except that a post was attached horizontally to the bottom to prevent the sheep from escaping underneath the gates. The gates were not locked, but were held in place by attaching a wire to a post and tightening it. Brown testified that the last chore each evening

was to check to ensure that the herd was where it belonged and that the gates were closed.

Sheep tend to herd together and are not prone to escape from fencing. Brown testified that on occasion, one or two sheep had escaped, but he was always able to recover them. He further testified that in his 25 years of operating a sheep ranch, he had never lost a sheep by escape.

In 1986 and 1987, the Browns' sheep were counted in their entirety three times per year: (1) when the sheep were sheared, which was normally in February; (2) when the ewes were lambing, which could vary from midwinter or late winter to early spring; and (3) when the lambs were weaned, which was usually in November. In addition to the triannual counts, periodic rough counts were performed.

The Browns maintained a written inventory of their sheep. The actual count of the sheep was performed by Brown and Todd J. Storbeck, who is the Browns' son-in-law. There was evidence that Brown and Storbeck counted independently of one another and then compared their tallies when the counts were completed. Brown and Storbeck furnished the figures to Mrs. Brown, who was the bookkeeper. She recorded the counts in an inventory record. Any decrease to the herd due to death or sale, for example, was reflected in the inventory records. During the entire existence of their sheep operation, the Browns had practiced the inventory method as described.

In the previous 25 years, the Browns never experienced any discrepancies between their head count and the count reflected in their inventory records. In 1985, 132 sheep were missing, and the Browns suspected theft. Due to the suspected theft of their sheep in 1985, the Browns contacted their insurance agent, Barton Kreider, and purchased insurance through him from Farmers. Farmers is an insurance company with its headquarters located in Lincoln, Nebraska, and issues farm insurance policies throughout Nebraska.

The policy issued by Farmers to the Browns covered "direct loss to insured farm personal property caused by . . . **Theft or Attempted Theft.**" It excluded theft (1) committed by an insured person, (2) if the only evidence is an inventory shortage, (3) caused by wrongful conversion or embezzlement, (4) caused

by escape, or (5) if the only evidence is mysterious disappearance. The period of the policy was 36 months, with an effective date of August 19, 1986.

Four hundred and eighty-eight ewes were counted in November 1986. In January 1987, 403 ewes were counted when they were sheared. Of the 85 missing ewes, Brown discovered 8 dead, leaving 77 ewes for which he could not account. Brown testified that at the time of their disappearance, the missing ewes were worth $85 per head, for a total of $6,545. The Browns reported the loss to their insurance agent and the Nebraska State Patrol.

On November 6, 1987, when he "weaned the lambs out," Brown counted 491 ewes and 444 lambs. The increase in the number of sheep which occurred between January and November 1987 was due to the Browns' purchase of replacement animals. At that time, the Browns could account for all of the sheep. On November 19, 1987, Brown counted 365 lambs when he delivered them to a livestock market. He found the remnants of 7 lambs which had been killed by coyotes, leaving a loss of 72 lambs. After discovery of the loss of lambs, the ewes were counted on the afternoon of November 19, 1987. The count yielded a total of 44 missing ewes. He valued the missing ewes in the amount of $3,815 and the lambs which he lost in the sum of $5,154.08. The Browns again reported the losses to their insurance agent and the Nebraska State Patrol, and also contacted the county sheriff's office.

After the disappearance of the sheep in January and November 1987, in an effort to locate the sheep, Brown searched his entire ranch and the surrounding lands and inquired of his neighbors. Aerial searches were conducted. Neither the Browns nor law enforcement personnel were ever able to locate the missing sheep.

The Browns filed claims for the missing sheep with their insurance agent under the theft provisions of the policy issued to them by Farmers. Farmers denied the claims on the basis that the Browns failed to show that the sheep were stolen.

Brown testified that he or his wife did not take the sheep, that he did not temporarily place them elsewhere, and that none of his employees hid or embezzled the sheep. Mrs. Brown,

Storbeck, and Patrick M. Meng, who was employed in the sheep operation by the Browns, stated that they did not take the sheep.

The ewes' disappearance in January coincided with an increased price for ewes and wool and with the time for marketing the ewes. At the time of the second disappearance in November 1987, the lambs were ready for market, and the price for lambs and ewes was attractive.

Brown testified that after he discovered the losses in November 1987, he inspected the fences in the two pastures and did not find any places where the fence was down or broken. During the period of time in question, Brown never discovered any breaks in the fences, loose fences, areas through which sheep could escape, or gates left open. Brown stated that his sheep did not jump over fences.

After the losses were discovered, the inventory records were reviewed. No mistakes were uncovered, and the records reflected the actual physical counts.

There was testimony that the only predators of sheep in the area of the Browns' ranch were coyotes, dogs, foxes, and eagles and that the Browns suffered predation problems. There was testimony that a predator does not completely devour a sheep and leaves behind the traces of any sheep which the predator kills. Brown testified that he could account for all losses caused by predators.

As stated, there were also an unfenced lake and canal bordering the north pasture. Brown testified that he did not need a fence around water because sheep "just don't go in the water" and that he had never caught any sheep wading in the water or discovered that any sheep had crossed the canal. There was also testimony that sheep did not walk upon Lake Whitney when it was frozen.

Without objection, Brown testified as to a method by which the sheep could have been stolen. He stated that thieves could enter his land through unlocked gates from the county roads, round the sheep up with sheep dogs into portable corrals, and pick them up and place them in a livestock trailer.

The Dawes County sheriff, Karl J. Dailey, testified that he believed a livestock thief or thieves were operating in Dawes

County. Gary H. Renner, a sergeant in the investigative services of the Nebraska State Patrol, testified that it was his opinion that from 1985 through 1987, a livestock thief or thieves were operating in the Dawes County area.

On February 26, 1988, the Browns filed the instant action, claiming, in substance, that the losses of their sheep and other damages were covered under the theft provisions of the policy issued to them by Farmers. Farmers admitted that the policy was issued by it to the Browns, that the policy was in full force and effect during the time when the Browns claimed the sheep were stolen, and that the Browns made timely claims for all the losses which occurred. Farmers further agreed that Kreider was an agent of Farmers and was, at all times, acting within the scope of his authority in performing services for it. The central issue at trial was whether the Browns proved that the sheep were stolen. The jury entered a verdict in the amount of $16,636.70 in favor of the Browns. This appeal followed.

## I. DIRECTED VERDICT

At the close of the plaintiffs' case in chief, Farmers moved for a directed verdict. The court overruled that motion. Farmers thereupon adduced additional evidence by way of testimony and a videotape exhibit. Farmers did not move for a directed verdict at the close of all the evidence. On appeal, Farmers, in support of its first assignment of error, contends that because the Browns failed to show that the disappearance of the sheep was the result of theft, which is the only insured peril applicable to this case, the trial court erred in failing to sustain its motion for a directed verdict and to dismiss the case.

"A defendant who moves for a directed verdict at the close of the plaintiff's evidence and, upon the overruling of such motion, proceeds with trial and introduces evidence waives any error in the ruling on the motion for a directed verdict. [Citations omitted.]" *Lincoln Co. Sheriff's Emp. Assn. v. Co. of Lincoln*, 216 Neb. 274, 277, 343 N.W.2d 735, 738-39 (1984). Accord, *Church of the Holy Spirit v. Bevco, Inc.*, 215 Neb. 299, 338 N.W.2d 601 (1983); *Schaffer v. Strauss Brothers*, 164 Neb. 773, 83 N.W.2d 543 (1957); *Mack v. Parkieser*, 53 Neb. 528, 74 N.W. 38 (1898). Therefore, there is no question to be reviewed

by this court regarding Farmers' motion for a directed verdict.

## II. INSTRUCTIONS

Farmers requested the trial court to submit its instruction No. 5, which states, "Where several inferences are [deducible] from the facts presented, which inferences are opposed to each other but equally consistent with the facts proved, the [plaintiffs] do not sustain their burden of proof by a reliance alone on the inferences that would entitle them to recover." In its instruction No. 6, the trial court defined direct and circumstantial evidence and instructed the jury that the law made no distinction between those two types of evidence and that a fact could be proved by either direct or circumstantial evidence or both. Instruction No. 6 was taken verbatim from NJI2d 1.31. The court overruled Farmers' objection to the giving of instruction No. 6 and to the court's failure to give Farmers' requested instruction No. 5. Farmers' second assignment of error alleges that by doing so, the trial court allowed the jury to render judgment in the Browns' favor if the jury found theft to be equally possible with other explanations for the missing sheep.

In order to establish as error the trial court's refusal to give a requested instruction, an appellant is under a threefold burden to show that he or she was prejudiced by the court's refusal, that the tendered instruction is a correct statement of the law, and that the instruction is applicable to the evidence in the case. [Citations omitted.]

*Chadron Energy Corp. v. First Nat. Bank*, 236 Neb. 173, 184, 459 N.W.2d 718, 728 (1990). All the jury instructions given must be read together, and if, taken as a whole, they correctly state the law, are not misleading, and adequately cover the issues supported by the pleadings and evidence, there is no prejudicial error necessitating reversal. *Denesia v. St. Elizabeth Comm. Health Ctr.*, 235 Neb. 151, 454 N.W.2d 294 (1990). It is not error on the part of a trial court to refuse to give a requested instruction if the substance of that request is contained in the instructions actually given. *Id.*

The trial court instructed the jury that it must not indulge in any speculation, guess, or conjecture. The jury was instructed

that before the Browns could recover against Farmers under the theft provisions of the policy, the Browns were required to

prove by the greater weight of the evidence each and all of the following:

1. That they suffered a loss of sheep.

2. The number of sheep lost.

3. That the loss was a theft loss as defined by the policy.

4. The actual cash value of the sheep at the time of the loss and any other damages resulting from direct loss by theft.

The district court further instructed the jury that if the Browns did not meet their burden of proof, then its verdict must be for Farmers. The instructions informed the jury that recovery could not be had for theft by the Browns, inventory shortage, wrongful conversion or embezzlement, escape, or mysterious disappearance. Most importantly, the trial court instructed the jury that the party who has the burden of proving a claim must do so by the greater weight of the evidence; that the greater weight of the evidence means evidence sufficient to make a claim more likely true than not true; and that if the evidence upon a claim is evenly balanced or if it weighs in favor of the other party, then the burden of proof has not been met.

The instructions given to the jury clearly informed the jury that it could not render a verdict in favor of the Browns unless it found that the Browns proved their case by the greater weight of the evidence. These instructions foreclosed the jury from choosing among several inferences which were opposed to each other but equally consistent with the facts proved. As the substance of requested instruction No. 5 was contained in the instructions actually given, the trial court did not err in refusing to give that instruction. Nor did the trial court err in giving instruction No. 6. The instructions given by the court, taken as a whole, correctly state the law, are not misleading, and adequately cover the issues supported by the pleadings and evidence.

### III. EVIDENTIARY ISSUES

In its third assignment of error, Farmers complains that the trial court permitted two law enforcement officers to testify

whether in their opinion a livestock thief or thieves were operating in Dawes County at times relevant to this case. Over an objection on the basis of hearsay, inadequate foundation, and relevance, Sheriff Dailey opined that a livestock thief or thieves were operating in Dawes County. Sheriff Dailey's opinion was based on conversations with other law enforcement professionals, brand inspectors, his deputy, and area farmers and ranchers; reports and bulletins of livestock thefts received by his office; and his training in basic investigation. Sergeant Renner testified that it was his opinion that in the years 1985 through 1987, a livestock thief or thieves were operating in the Dawes County area. Farmers' objection to Sergeant Renner's testimony on the grounds of relevancy, hearsay, foundation, and invasion of the province of the jury was overruled. Sergeant Renner's opinion was based on intelligence from confidential sources, reports from other agencies, and investigative reports from State Patrol troopers and investigators.

While Farmers attacks the foregoing testimony on the grounds of impermissible expert testimony, its contention necessarily raises the question of the relevance of that testimony. See *State v. Reynolds*, 235 Neb. 662, 457 N.W.2d 405 (1990) (in determining whether an expert's testimony is admissible pursuant to the Nebraska Evidence Rules, a court considers, among other interrelated questions, whether the expert's testimony is relevant). See, also, Neb. Rev. Stat. § 27-402 (Reissue 1989) (only relevant evidence is admissible). "Relevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Neb. Rev. Stat. § 27-401 (Reissue 1989). "To be relevant, evidence must be rationally related to an issue by a likelihood, not a mere possibility, of proving or disproving an issue to be decided. [Citations omitted.]" *State v. Lonnecker, ante* p. 207, 210, 465 N.W.2d 737, 740-41 (1991).

The evidence that a livestock thief or thieves were operating in Dawes County makes it more likely that the Browns' sheep were stolen. Although an expert's testimony may be relevant, it

may be excluded if the probative value of the testimony is substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, or needless presentation of cumulative evidence. *Reynolds, supra*; Neb. Rev. Stat. § 27-403 (Reissue 1989). There is nothing to suggest a decision on an improper basis in this case. See *Lonnecker, supra* (in the context of § 27-403, "unfair prejudice" means an undue tendency to suggest a decision on an improper basis). A trial court's ruling on the relevancy of evidence will not be disturbed on appeal unless there has been an abuse of discretion, and the trial court's ruling with respect to § 27-403 is likewise reviewed under an abuse of discretion standard. *State v. Baltimore*, 236 Neb. 736, 463 N.W.2d 808 (1990). The trial court did not abuse its discretion in finding the officers' testimony relevant and not prejudicial.

"If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." Neb. Rev. Stat. § 27-702 (Reissue 1989). Farmers first contends that neither officer was qualified as an expert in theft investigation and, therefore, neither should have been allowed to testify that a livestock thief or thieves were operating in Dawes County.

No exact standard is possible for fixing the qualifications of an expert or skilled witness. *Herman v. Lee*, 210 Neb. 563, 316 N.W.2d 56 (1982). An expert or skilled witness will be deemed qualified if, and only if, he or she possesses special skill or knowledge respecting the subject matter involved so superior to that of men in general as to make his or her formation of a judgment a fact of probative value. *Northern Nat. Gas Co. v. Beech Aircraft Corp.*, 202 Neb. 300, 275 N.W.2d 77 (1979); *Mathine v. Kansas-Nebraska Nat. Gas Co., Inc.*, 189 Neb. 247, 202 N.W.2d 191 (1972). A trial court's factual finding that a witness qualifies as an expert will be upheld on appeal unless clearly erroneous. *Reynolds, supra.*

As an initial matter, it is questionable whether Farmers properly raised the issue of Dailey's and Renner's expert qualifications at trial by way of a general foundation objection.

If a general objection on the basis of insufficient foundation is overruled, the objecting party may not complain on appeal unless (1) the ground for exclusion was obvious without stating it or (2) the evidence was not admissible for any purpose. *Sherard v. Bethphage Mission, Inc.*, 236 Neb. 900, 464 N.W.2d 343 (1991).

Even assuming arguendo that Farmers could avoid an adverse application of the rule expressed in *Sherard*, its argument that both law enforcement officers were not qualified as experts is without merit. Sheriff Dailey testified that he had been a police officer in Chadron and that his present duties encompassed investigating criminal activities. He further stated that he had been involved in investigating livestock thefts and that his office investigated the theft of the Browns' sheep. Sergeant Renner was a 24-year veteran of the Nebraska State Patrol. His job duties comprised conducting and supervising criminal investigations in the Panhandle area of the state. Sergeant Renner testified that State Patrol officers receive training in theft investigations, including livestock thefts. He further testified that he personally had investigated livestock thefts. The disappearance of the Browns' sheep was investigated by the State Patrol. Upon a review of the foregoing, it is clear that the trial court was not clearly erroneous in finding that the officers possessed special knowledge respecting area livestock thefts so superior to that of men in general as to make their opinions facts of probative value. We further note that the trial court instructed the jury that it was the sole judge of the credibility of the witnesses and that it determined the weight to be accorded expert testimony.

Farmers next contends that even if Dailey and Renner qualified as experts, their testimony did not "assist the trier of fact [in determining] a fact in issue." Generally, expert testimony is admissible only if it will be of assistance to the jury in its deliberations and relates to an area not within the competency of ordinary citizens. *Dotzler v. Tuttle*, 234 Neb. 176, 449 N.W.2d 774 (1990). The determination of whether an expert's testimony or opinion will be helpful to a jury or assist the trier of fact will be upheld on appeal unless the trial court abused its discretion. *State v. Reynolds*, 235 Neb. 662, 457

N.W.2d 405 (1990).

The fact that a livestock thief or thieves were operating in Dawes County was within the specialized knowledge of law enforcement personnel, and not within the competency of ordinary citizens, and assisted the jury in determining whether the Browns' sheep were stolen. The district court did not abuse its discretion.

Farmers' further claim that the officers' testimony constituted impermissible hearsay is unfounded. "[R]ule 703 of the Nebraska Evidence Rules allows experts to rely on hearsay facts or data reasonably relied upon by experts in the field as a basis for their opinion." *State v. Hayden, ante* p. 286, 293, 466 N.W.2d 66, 70 (1991) (citing *Gibson v. City of Lincoln*, 221 Neb. 304, 376 N.W.2d 785 (1985)). Sheriff Dailey testified that the information upon which he based his opinion was information upon which he regularly relied in his duties as sheriff. Sergeant Renner asserted that the information which was the basis of his opinion was of the type which is normally relied upon by people in the law enforcement profession. The trial court did not abuse its discretion in permitting the expert testimony which was based upon hearsay. See *State v. Hayden*, 233 Neb. 211, 444 N.W.2d 317 (1989) (reviewing a hearsay challenge to expert testimony under an abuse of discretion standard). Farmers' third assignment of error is meritless.

## IV. WOOL INCENTIVE PAYMENTS

In its fourth assignment of error, Farmers, in substance, complains that the trial court erred in permitting the Browns to recover wool incentive payments which the Browns would have received had their sheep not been stolen. Brown testified that due to the reduction in the number of the Browns' sheep by theft, his wool incentive payments were decreased. As Brown explained, the federal government pays sheep owners an incentive based on the weight of an animal's wool. The source of the payments was from imports of sheep from New Zealand and Australia. The parties stipulated that if the loss was covered under the Browns' insurance policy, the amount of the loss was $1,022.62. The sum of $1,022.62 was arrived at by multiplying the number of sheep lost by the dollar amount of the incentive

payments which would have been received had the sheep not been lost. The jury awarded the Browns the claimed amount for the lost wool incentive payments.

Farmers argues that the Browns' policy covered only the losses of the sheep themselves. Therefore, it maintains that the damages for the lost wool incentive payments fall outside the coverage of the policy.

Our analysis begins with the terms of the policy, which provided coverage for "direct loss to insured farm personal property" caused by theft. Apart from the question of whether the wool incentive payments were a "direct loss" caused by theft, Farmers asserts that the wool incentive payments are not "insured farm personal property."

Nowhere in the policy is "insured farm personal property" defined. Nonetheless, we are guided by a number of well-established rules. In order to recover under an insurance policy of limited liability, an insured must bring himself or herself within its express provisions. *Ditloff v. State Farm Fire & Cas. Co.*, 225 Neb. 375, 406 N.W.2d 101 (1987). When the terms of an insurance policy are clear, they are to be accorded their plain and ordinary meaning. *Allstate Ins. Co. v. Farmers Mut. Ins. Co.*, 233 Neb. 248, 444 N.W.2d 676 (1989). When a clause in an insurance contract can fairly be interpreted in more than one way, there is ambiguity to be resolved by the court as a matter of law. *Polenz v. Farm Bureau Ins. Co.*, 227 Neb. 703, 419 N.W.2d 677 (1988). The resolution of an ambiguity in a policy of insurance turns not on what the insurer intended the language to mean, but what a reasonable person in the position of the insured would have understood it to mean at the time the contract was made. *Id*. In the case of ambiguity in an insurance contract, a construction favorable to the insured prevails so as to afford coverage. *Id*. Accord *Malerbi v. Central Reserve Life*, 225 Neb. 543, 407 N.W.2d 157 (1987).

Under one plausible interpretation, by narrowly focusing on the words "insured farm personal property," a reasonable person in the position of the insured could interpret that language as restricting coverage to losses of the sheep themselves, irrespective of the question of whether the losses were direct or not. Alternatively, the policy could fairly be

interpreted as providing that so long as "insured farm personal property" is stolen, any loss directly attributable to that theft is also covered. Because the policy language is ambiguous, the terms are construed in favor of the Browns so that "farm personal property" includes wool incentive payments.

The remaining issue to be decided is whether the wool incentive payments were a "direct loss" caused by theft. With respect to theft insurance, it has been said, "The policy of insurance may limit recovery to 'direct' loss, which is generally construed as meaning the proximate as opposed to a remote loss." 10A G. Couch, Cyclopedia of Insurance Law § 42:76 at 218-19 (rev. 2d ed. 1982). Nebraska is in accord with this rule. In *Clouse v. St. Paul Fire and Marine Ins. Co.*, 152 Neb. 230, 233, 40 N.W.2d 820, 823 (1950), this court held, " 'Direct,' as so used, means 'immediate' or 'proximate,' as distinguished from 'remote' or 'incidental.' [Citations omitted.]" We further explained:

> In determining the cause of a loss for the purpose of fixing insurance liability, when evidence of concurring causes of the damage appears, the proximate cause to which the loss is to be attributed is the dominant, the efficient one that sets the other causes in operation; and causes which are incidental are not proximate, though they may be nearer in time and place to the loss. [Citations omitted.]

*Id.* at 234, 40 N.W.2d at 823. See, also, *Lydick v. Insurance Co. of North America*, 187 Neb. 97, 187 N.W.2d 602 (1971) (death of cattle not a direct loss caused by windstorm because the wind combined with a number of other factors to produce the loss).

In this case, there is no cause for the loss of wool incentive payments other than the theft of the sheep. The theft of the sheep directly caused the reduction in wool incentive payments, as those payments correspondingly decreased by the number of sheep stolen. Farmers' fourth assignment of error is without merit.

The judgment of the district court for Dawes County must be affirmed.

The Browns are awarded $2,500 to apply toward their attorney fees incurred in this appeal. See, Neb. Rev. Stat.

§ 44-359 (Reissue 1988); *Havelock Bank v. Western Surety Co.*, 217 Neb. 560, 352 N.W.2d 855 (1984).

AFFIRMED.