Mary Jo BIECK, Plaintiff,

v.

**ALLIED MUTUAL INSURANCE COMPANY, a/k/a Allied Group Insurance, Defendant.**

No. 7:CV93–0419.

United States District Court, D. Nebraska.

June 17, 1994.

Terrence J. Salerno, Omaha, NE and James E. Schneider, North Platte, NE, for plaintiff.

Gary L. Dolan, Lincoln, NE, for defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND RELATED ORDER

KOPF, District Judge.

The court previously found Defendant liable to Plaintiff when it granted an unopposed motion for summary judgment. (Filing 39).

After a well-tried bench trial, I now issue my findings of fact and conclusions of law regarding the issue of damages,[1] as required by Federal Rule of Civil Procedure 52.

1. This court has jurisdiction pursuant to 28 U.S.C. § 1332(a) because the amount in controversy exceeds $50,000 and the parties are of diverse citizenship, Mary Jo Bieck (Bieck) being a resident of Nebraska and Allied Mutual Insurance Company (Allied) being an Iowa corporation authorized to do business in Nebraska.

2. This lawsuit is the result of an automobile collision that occurred on July 24, 1991, in Phelps County, Nebraska.

(a) The vehicle in which Bieck was riding was struck from the rear by another car as Bieck's vehicle was attempting a left turn.

(b) Bieck's car was demolished, (Ex. 21), and she was seriously injured. In fact, the collision was sufficiently severe that local doctors suspected a "cervical 3 cortical fracture," and, as a consequence, had Bieck "life-flighted" from the local hospital to a regional hospital. (Ex. 68 Bryan Hosp.Admis.Summ.) No fracture was found. (*Id.*)

(c) The driver of the other vehicle was negligent, and said negligence was the proximate cause of the accident and Bieck's subsequent injuries.

3. Allied issued Bieck an automobile insurance policy, in force on July 24, 1991, the date of the subject accident, which provided underinsured motorist coverage to Bieck in the sum of $300,000.

4. The driver of the vehicle which hit Bieck was underinsured. His insurance carrier paid Bieck $100,000, the policy limits of the applicable insurance.

5. Bieck settled with the driver of the car which hit her and his insurance company, after notice to Allied, and with the prior knowledge and consent of Allied authorizing settlement for the driver's policy limits.

6. Based upon the prior order granting summary judgment, Bieck. is entitled to a judgment against Allied that Allied is liable to her on the underinsured motorist coverage provided by Allied.

7. As a direct and proximate result of the July, 1991, accident, Bieck sustained a closed-head injury resulting in significant and permanent emotional and physical pain (severe headaches), significant and permanent cognitive (thinking) disability and, for virtually all employment purposes, permanently disabling her.[2] This conclusion is based in part upon the opinions of two neurologists, (Exs. 22, 65), and a psychiatrist. (Ex. 23.) Those views were essentially confirmed by the treating rehabilitation physician. (Exs. 24, 102.)[3]

(a) A closed-head injury is the name for an injury to the brain essentially resulting in damage to the cellular structure of that organ. The injury is caused by the brain tissue being violently moved within the restrictive confines of the skull. This injury can occur as a result of the head striking an object or the head and neck being jerked rapidly forward and backward. Bieck's auto accident is the classic type of accident which causes this type of injury. Because the damage to the brain is at the cellular level, imaging studies (such as MRI and CAT) do not reveal the damage. The testimony of Dr. Andrews, one of Bieck's neurologists, was particularly helpful on this point. (Ex. 22, at 20:22–25; 21:1–23:14.) The symptoms of this injury include marked personality change, usually for the worse; marked irritability; development of "organic," rather than functional, depression that extends well beyond normal depression; sleep problems; difficulties with attention and concentration (such as when several minutes pass by without the

---

1. Any finding of fact more properly construed as a conclusion of law shall be so construed. Any conclusion of law more properly construed as a finding of fact shall likewise be so construed.

2. Bieck also suffered from "tenderness over the spine" but without neurologic abnormalities. (Ex. 65 (Differential Diagnosis of 7/2/92).) I do not find that this condition was permanent or disabling, and Bieck is therefore entitled only to nominal nonmonetary damages for this injury plus the out-of-pocket medical expenses necessarily incurred as the result of what is in effect a bad sprain.

3. Allied engaged no experts, relying solely on Bieck's experts to advance its defense.

patient being aware of what is going on); difficulty with memory; and auditory- and visual-perception problems. (*Id.* at 12:25–20:21.) This type of injury is also frequently characterized by "absolutely nonstop headache." (*Id.* at 29:9–11.) Bieck suffered from "[v]irtually all," (*id.* at 20:22–25), of these "classic signs and symptoms," (*id.* at 12:14–17), including "a major headache problem." (*Id.* at 30:3.)

(b) The closed-head injury had a devastating impact upon Bieck's life as it changed her personality and left her essentially unable to deal with many of the basic chores of life.[4] For example, she now has trouble grocery shopping. As a further example of the impact of this injury, consider that Bieck and her husband, previously happily married, have now separated as a result of the change in her personality. For all practical purposes, Bieck is not the same person she was prior to the July, 1991, accident. Moreover, as her psychiatrist stated, Bieck simply could not engage in gainful employment outside a sheltered work environment. (Ex. 23, at 19:18–20:20.)

8. Allied raises three arguments regarding causation which, except for one minor point, I reject. First, Allied argues that at least some of Bieck's injury and consequent damages flowed from an accident in April, 1991. Second, Allied argues that at least some of Bieck's injury and consequent damages flowed from depression associated with the childhood sexual abuse she suffered. Third, Allied argues that at least some of Bieck's injury and consequent damage flowed from a later accident in May, 1993. Fundamentally, Allied argues that Bieck failed in her burden of proof to establish with reasonable assurance what portion of her injury and consequent damages where caused by the July, 1991, accident and what portion of her

injury and damages were caused by the other accidents and trauma Bieck suffered. For purposes of this case only, I assume, without deciding, that Bieck has the burden of proof ascribed to her by Allied. *See Nebraska Jury Instructions*, § 4.09, Comment II(A), at 225–30 (2d ed. 1992) (NJI2d) (recognizing the uncertainty in Nebraska law on who has the burden of proof on apportionment). However, I find and conclude that Bieck has generally satisfied her burden, recognizing that Bieck must only establish that it is more probable than not that her injuries and damages were caused by the July, 1991, accident, and not some other event. *Id.* § 2.12A. I come to this conclusion, for among other reasons, the following:

(a) While it is true that Bieck was in a minor auto accident in April, 1991 (which resulted in no damage to her car and nothing more than a slight back/neck sprain to Bieck)[5] and while it is true that she had been treated (and was receiving treatment) for childhood sexual abuse, the testimony was simply overwhelming, from both numerous lay witnesses and Bieck's therapist, that Bieck was a happy and fully functioning adult at the time of the accident in July, 1991. She was an active and productive wife and mother who worked part time as an aerobics instructor. She devoted a significant amount of time to her church. By contrast, *every* witness testified to a dramatic change after the July, 1991, accident when, for example, Bieck became perplexed by even the simplest of life's challenges.

(b) The medical evidence, including testimony and reports from doctors specializing in neurology, psychiatry and psychology, is also overwhelming that Bieck was very seriously injured as a result of the July, 1991, accident. For example, after two months at a hospital specializing in the treatment of

---

4. With the help of her husband, neighbors, and church members, Bieck is able to care for herself and her three children in the family home. (Even though she and her husband have separated, he continues to provide significant and ongoing support, both financially and otherwise.) In many respects, Bieck is lucky to live in a relatively small town surrounded by incredibly caring people. In any event, I find that she is not totally disabled from caring for herself and her children in the family home. Even though she is

not totally disabled from caring for herself and her children, however, Bieck is significantly disabled in this area.

5. According to one medical record, Bieck gave a history which recounted that this accident resulted in little more than "sore spots" in her back. (Ex. 65.) There is no evidence to suggest that Bieck's injury was more severe.

neurological injury, a treating doctor concluded that Bieck had sustained a "closed head injury with cognitive deficits." (Ex. 58, at 2 (Meadowbrook Hosp. Discharge Summ. of 8/25/92).)

(c) Another professional stated that the cognitive deficits Bieck suffered included "deficits in sustained attention, learning of new information and verbal fluency" with a *"catastrophic* reaction to her neuropsychological deficits." (Ex. 64 Richard H. Young Hosp. Neuropsychological Evaluation of 11/6/91, at 4 (emphasis added).)

(d) It is true that one psychologist thought Bieck's continued psychological difficulties were a product of childhood sexual abuse. (Ex. 62 Summ. of 1/12/93, at unmarked 4.) However, the same psychologist found neurocognitive "abnormalities" in the "domains" of "delayed visual memory, visual and verbal learning efficiency, and sustained attention." (*Id.*)[6] This psychologist does not clearly explain why he felt childhood sexual abuse issues, rather than the closed-head injury, were causing Bieck's difficulties. For example, he does not explain why Bieck could function fully as a wife, mother, aerobics instructor, and Sunday school teacher before the accident, but could not function at all after the accident. As a result, I choose not to credit his opinion.

■ (e) In any event, much more persuasive to me was the testimony of Bieck's therapist on the sexual abuse issues. She saw Bieck on regular occasions both before and after the July, 1991, accident. The therapist testified forcefully and persuasively that prior to the accident Bieck was dealing with her past abuse effectively and was essentially fully and happily functioning, but after the July, 1991, accident Bieck's mental and emotional condition changed dramatically for the worse. As a result, I conclude that even if childhood sexual abuse issues played a part in Bieck's condition, the July, 1991, accident aggravated an essentially dormant

(or at least stabilized) preexisting condition which would not, by itself, have caused Bieck the pain and disability she presently endures. NJI2d § 4.09, at 231 (collecting cases). Therefore, Allied cannot escape liability under Nebraska law because of the alleged preexisting condition. *Id.* ("If defendant's negligence activates a dormant preexisting condition or injury, which would not by itself have caused plaintiff any pain or disability, then the defendant is liable for the entire result.")

(f) As for the May, 1993, accident, very little was presented in the way of concrete evidence about the nature and severity of the accident, or what actually happened to Bieck. What little evidence there was established that Bieck filed a tort claim against the City of McCook (the apparent owner of the other vehicle) for $100,000, which claim has not been resolved. The accident was apparently very minor, however. Two of Bieck's close friends saw her on the day of the accident, shortly after it had taken place. Mary Lambing was at Bieck's home when Bieck returned after the accident. According to Lambing, although Bieck complained of some "stiffening" of her muscles, she "was more concerned with the car." Camille Ayers also saw Bieck later that day and described Bieck as "[s]tiff was about it" and "[s]he didn't have a headache at that particular time which was almost unusual since the July accident."

(g) The evidence further indicated that Bieck sought treatment in June, 1993, from an orthopedic surgeon who diagnosed her May, 1993, injury as a "musculoskeletal sprain," essentially "[j]ust an aggravation of what she had previously going on there." (Ex. 101, at 20:21–24.) The doctor agreed with Bieck's lawyer that if Bieck had complaints of persistent back and neck pain for 12 to 18 months before she consulted him in the summer of 1993, he would "conclude then that those were permanent conditions related to the 1991 accident." (*Id.* at 20:14–19.)[7] By

---

**6.** While some of the doctors described Bieck's impairment as "mild" or "moderate," it is clear that these terms are relative and not intended to diminish the severity of her impairment. (Ex. 102 at 25:16–26:19.) According to the rehabilitation physician who treated Bieck, people who have "mild" brain impairment nevertheless suffer an impairment which "significantly" impacts "their ability to function." (*Id.* at 26:16–17.)

**7.** From the start, Bieck had some neck or back pain from the July, 1991, accident, but the severe pain was from constant headaches. (Ex. 64

July, 1993, at the time of her last visit, the doctor concluded that Bieck had improved and that "the problems with the third accident would eventually be resolved." (*Id.* at 18:3–11.) Bieck suggested in the history she gave this doctor that she thought the third accident had aggravated, among other things, the headaches and her thinking problems. (*Id.* at 11:7–14.) She gave her psychiatrist a similar history. (Ex. 59.) The orthopedic surgeon did not treat Bieck for the closed-head injury and agreed that such a condition was outside his area of expertise. (Ex. 101, at 19:3–10.)

(h) To the extent Allied argues that the evidence regarding this third accident establishes that the accident somehow partially caused or otherwise aggravated Bieck's closed-head injury damage and that Bieck failed to properly prove apportionment of closed-head injury damages as between the July, 1991, accident and the May, 1993, accident, I am not persuaded that the back sprain has anything to do with the closed-head injury. Bieck adduced specific evidence, taken from medical tests conducted *prior* to the third accident, by *unrelated* health care professionals, that she suffered *measurable* cognitive deficits as a result of the July, 1991, accident. (Ex. 58, particularly Meadowbrook Hosp. Neuropsychological Screening Evaluation of 8/25/92, at 4 ("Neuropsychological findings indicate a profile of impairment with attention and concentration. . . ."); Ex. 64 Richard H. Young Hosp. Neuropsychological Evaluation of 11/6/91, at 4 ("Neuropsychological evaluation reveals deficits in sustained attention, learning of new information and verbal fluency.").) Moreover, the lay testimony established without contradiction [8] that there was no change in Bieck's closed-head injury problems *after* the May, 1993, accident. Thus, I do not believe the closed-head injury damages are in any way attributable to the illusive accident of May, 1993. There is simply

no apportionment problem regarding the closed-head injury damages raised by this evidence.

(i) To the extent that Allied particularly relies on Bieck's statements in the medical history that the May, 1993, accident somehow aggravated her closed-head injury, this history, otherwise unsubstantiated, is not a reliable foundation upon which to base any sound finding or conclusion. Bieck's mental condition, particularly her depression and cognitive deficits, counsels against reliance on her ability to critically distinguish between the two events without strong corroborative evidence. This is particularly true where, as here, the medical history she gave is substantially rebutted by the lay witnesses who had occasion to observe Bieck both before and after the 1993 accident. To a person, they observed no change from the catastrophe of the July, 1991, accident.

(j) There is little doubt that the 1993 accident did aggravate Bieck's prior back sprain, first caused by the July, 1991, accident. However, Bieck's back problems are so minor as to be inconsequential when compared to the closed-head injury for purposes of computing the great bulk of the damages; that is to say, it is more probable than not that Bieck would have been in the same sad condition she is in today had she not suffered the aggravation of the back sprain. Moreover, the aggravation of the sprain appears to have been essentially resolved in July, 1993, when the orthopedic surgeon stopped treating Bieck. These two factors, taken together, suggest that any apportionment issues raised by the aggravation of the back sprain are insignificant and limited as to time.

(k) I make the following specific findings and conclusions regarding the evidence regarding the aggravation of the back sprain: (1) the evidence does not suggest that Bieck

---

(Neuropsychological Evaluation of 11/6/91).) As noted earlier, this type of headache is a classic sign and symptom of a closed-head injury. (Ex. 22, at 29:9–11.)

**8.** For example, Bieck's husband, who saw her more than once a week during this time, specifically testified that he did not observe any

"changes that occurred to Mary Jo either in her behavior, her ability to care for the boys, her personality, her interactions with [her husband] that occurred as a consequence of the accident in May of 1993." Mary Lambing and Camille Ayers, close friends who saw Bieck frequently, also confirmed this view.

is trying to recover for medical expenses associated with the aggravation of her prior back sprain and, thus, no apportionment issue arises as to medical expenses paid in the past; (2) the evidence does not suggest that Bieck is seeking to recover for medical expenses associated with future treatment for the aggravation of her back sprain and, thus, no apportionment issue arises as to medical expenses to be incurred in the future; and (3) the evidence does not suggest that the aggravation of the back sprain was permanent or likely to cause Bieck to suffer pain in the future and, thus, no apportionment issue arises as to future disability or future pain and suffering.

(*l*) The only apportionment issues raised by the evidence pertaining to the aggravation of the back sprain are how to apportion the physical pain Bieck suffered from May, 1993, through July, 1993, and how to apportion her lost wages during that time. Out of an abundance of caution, I shall not award Bieck damages for the physical pain she suffered from May through July, 1993, nor shall I award her lost wages for this three-month period either.

■ 9. I find, and Allied does not dispute, that Bieck has incurred medical bills for treatment of injuries arising out of the accident of July 24, 1991, in the sum of $90,792.55, which charges are fair, reasonable, and necessitated by the injuries sustained in said accident.

10. Bieck is now 40 years of age and has a reasonable life expectancy of 37.91 years.

11. Bieck is currently expending between $700.00 and $800.00 per month for medical services and, during the balance of her lifetime, will continue to expend at least $700.00 per month (and with inflation of medical costs, probably a great deal more) for future care and medication associated with treatment of her closed-head injury.

9. At the time of the accident, aside from this part-time job, Bieck was not employed outside the home. She had a very limited employment history prior to and during her marriage. At the time of her marriage in 1978, she was employed as a nurse's aide. After her marriage, she worked as, among other things, a veterinarian's assistant. At the time of the July, 1991, accident,

12. Bieck earned an average of $52.72 per month as a part-time aerobics instructor prior to the accident.[9] She has not worked at this job since June 24, 1992, because of injuries sustained in the July 24, 1991, accident. Bieck has therefore lost 22 months' work at the rate of $52.72 per month, or a total of $1,159.84 in lost wages by the date of trial. However, as indicated earlier, I shall reduce this sum by the three-month period in 1993 when Bieck suffered a back sprain.

■ 13. Bieck's earning capacity has been impaired as a result of the accident to the extent that she is no longer able to be an aerobics instructor. Her earning capacity has also been impaired as to other vocations, but the evidence is simply too speculative to grant Bieck a loss of earning capacity at anything exceeding minimum wage employment. Even though Bieck was not working full time outside the home at the time of the accident, the diminution of her earning capacity is fully compensable. NJI2d § 4.01, at 4.01–6 ("The key is not lost earnings but lost earning capacity.... Loss of earning capacity is not necessarily measured by plaintiff's calling or income, if any, at the time of the injury.") (citations omitted) (collecting cases). Bieck has a reasonable work-life expectancy of 23 years. Accordingly, she is entitled to recover for the reduction in her earning capacity.

14. As a result of her closed-head injury, Bieck has sustained mental and physical disability, pain, and suffering (including loss of enjoyment of life) in the past and will continue to sustain such disability, pain, and suffering (including loss of enjoyment of life) for the balance of her reasonable life expectancy of 37.91 years.

15. The following constitutes my computation of the actual damages sustained by Bieck as a result of the July, 1991, accident:[10]

Bieck intended to stay at home to raise her children and then pursue a college education and a nursing degree. Her youngest child is now about 4 years old, and her oldest, about 13.

10. In determining these amounts, I have generally followed Nebraska's pattern jury instruction on damages. NJI2d § 4.01. However, I do not

| | |
|---|---|
| 1. Past medical care | $ 90,792.55 |
| 2. Future medical care | 125,000.00 |
| 3. Lost wages to date | 1,001.68 |
| 4. Loss of earning capacity | 75,000.00 |
| 5. Disability and pain and suffering | 300,000.00 |
| **TOTAL** | **$591,794.23** |

■ 16. Bieck's actual damages exceed the applicable insurance coverage of the tortfeasor, which is the sum of $100,000 and the $300,000 underinsured motorist coverage provided by Allied under the terms of its policy. However, Bieck's recovery for damages must be restricted to the $300,000 policy limit. *Shkolnick v. American Family Mut. Ins. Co.,* 2 Neb.App. 61, ——, 506 N.W.2d 356, 360 (Neb.App.1993).

17. Since she will not be fully compensated for her injuries when the tortfeasor's payment of $100,000 and the $300,000 limits of, her coverage are added together, Bieck is entitled to judgment against Allied for the full amount of the $300,000 coverage. The rule in Nebraska is that the insured's own carrier must compensate the insured to the limits of the carrier's underinsured motorist coverage if, after payments by any other legally liable person or organization, the insured still has not been fully compensated for her injuries. *Shkolnick,* 506 N.W.2d at 360 (applying Neb.Rev.Stat. § 60–578 (1992 Cum. Supp.)).

18. Allied concedes that its policy was issued after the 1990 effective date of the amendments to section 60–578 mentioned in *Shkolnick.* *See* Def.'s Br. at 2 ("The court should note that this Policy was issued after the effective date of [the amendments] to Neb.Rev.Stat. § 60–578...."). Allied argues, however, that the language of its policy trumps *Shkolnick.* I disagree.

(a) The policy states: "The limit of liability shown in the Declarations for this coverage is our maximum limit of liability for all damages resulting from one accident ... the limit of liability shall be reduced by all sums paid because of 'bodily injury' by or on behalf of persons or organizations who may be legally responsible." (Filing 1, Attach. (Underinsured Motorists Coverage Rider at 2).) There are two possible interpretations of this language. "Maximum limit of liability" might mean the total damages suffered by the insured, less amounts paid by the tortfeasor, not to exceed the dollar amount of coverage stated in the policy. Or, "maximum limit of liability" might mean the dollar amount of coverage stated in the policy, reduced by the payments made by the tortfeasor, without regard to the insured's actual damages.[11] The policy does not purport to provide either a literal or operational definition of "maximum limit of liability" for this purpose.

(b) Nebraska law defines now, and defined at the time the policy was issued, "maximum liability of the insurer" regarding underinsured motorist coverage in the way suggested by Bieck. Neb.Rev.Stat. § 60–578. Since the terms "maximum limit of liability" and "maximum liability of the insurer" address the same concept in essentially similar words, it is helpful to read the policy with that statutory declaration in mind. The statutory declaration is similar to the definition proposed by Bieck. While this similarity does not directly resolve the ambiguity in the policy, it does suggest that Bieck's reading of the policy is reasonable.

■ (c) In Nebraska, ambiguities are construed against the insurance company if a reasonable person in the position of the insured would have read the policy in the manner proposed by the insured. *Brown v. Farmers Mut. Ins. Co.,* 237 Neb. 855, 869, 468 N.W.2d 105, 115 (1991) ("The resolution of an ambiguity in a policy of insurance turns not on what the insurer intended the language to mean, but what a reasonable person in the position of the insured would have

understand there to be a loss-of-consortium claim by the husband in this case, and, accordingly, I have not addressed that issue. Where appropriate, all sums have been reduced to present value in accordance with Nebraska law. *Id.* § 4.13, at 234–35.

**11.** This interpretation, offered by Allied, is strained. In essence, Allied argues that it issued a policy of insurance that was not based upon the damages the insured actually suffered. This interpretation would mean that Allied would *never* pay the dollar amount of its coverage if the tortfeasor paid anything to the insured. Since by definition "underinsured" coverage presupposes some payment by the tortfeasor, the statement of the dollar amount of coverage in Allied's policy would be grossly misleading.

understood it to mean at the time the contract was made. In the case of ambiguity in an insurance contract, a construction favorable to the insured prevails so as to afford coverage.") (citations omitted). Since I find a reasonable ambiguity, I construe the ambiguity against Allied and in favor of Bieck.

19. Bieck has had the services of attorneys Terry Salerno and James E. Schneider in pursuing this matter. Pursuant to Neb. Rev.Stat. § 44–359 (Reissue 1988), Bieck is entitled to reasonable attorney fees to be paid by Allied.

20. By June 27, 1994, Bieck's attorneys shall file an application for allowance of attorney fees, supported by appropriate affidavits and a brief, and Allied's attorneys may respond by appropriate affidavits and a brief by July 8, 1994.[12]

21. The Clerk of the United States District Court for the District of Nebraska shall withhold entry of judgment in this case until further order of the court in order that the attorney-fees issue may be addressed.

IT IS ORDERED that:

(1) These findings of fact and conclusions of law shall be mailed to all counsel of record in this case;

(2) Counsel shall address the attorney-fees issue as provided in paragraph 20 of these findings of fact and conclusions of law;

(3) The Clerk of the United States District Court for the District of Nebraska shall withhold entry of judgment pursuant to paragraph 21 of these findings of fact and conclusions of law.

---

**12.** Each lawyer should take care to review the Local Rules on how to address the attorney-fees question. *See* NELR 83.14.